# Worrall's Appeal.

1. In a suit in equity the Supreme Court, on appeal, is bound to examine the evidence and determine what are the facts, and if satisfied that facts have been found without proof, or material facts established by the proofs have not been found, it follows that there has been plain mistake, for which the findings of a Master will be set aside, even though confirmed by the court of original jurisdiction.

2. Where a man who was usually in poor health shortly after coming of age made a deed nominally in consideration of fifteen dollars for real estate worth thirteen thousand dollars, being the greater part of his property, when he was so ill that it was not believed he would recover to a woman who had become a member of the same household when the grantor was four months old, who had nursed him in infancy and sickness and instructed him when young, who testified that her feelings to him as a mother were very strong, who had managed his property, and in whom he had confided:

    *Held*, upon a bill in equity brought to set the deed aside, that the burden was on the respondent to show that the transaction was fair and honest, and that the deed was not procured by undue influence.

May 29th, 1885.   Before MERCUR, C. J., GORDON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.   PAXSON, J., absent.

APPEAL from the Court of Common Pleas of *Mifflin county :* Of January Term 1885, No. 7.

Appeal of Clarence A. Worrall from a decree of said court dismissing his exceptions to the report of a Master reporting that the bill in equity filed in the case should be dismissed, etc.

This was a bill in equity filed by Clarence A. Worrall against Mary A. Bailey to set aside a certain deed executed by the complainant to the defendant.

The bill alleged that complainant was a son of Thomas A. Worrall; that the defendant had been a member in the household of complainant's father from shortly after complainant's birth until his father's death, and still occupied the family home; that defendant had from complainant's earliest childhood stood *in loco parentis* to him, and in her he imposed implicit confidence; that his father died leaving a will in which he bequeathed and devised certain properties to complainant and certain other properties to defendant; that on April 23d, 1879, when complainant was so ill that it was believed by himself and others that he would not recover, he was solicited by defendant to make a will in her favor, which he was willing to do.   She then sent for one John Baum and consulted with him, after which they both urged and advised that instead of making a will complainant should make a deed to her to take the place of a will, to be treated as a will, and not to be given

to her or recorded until after his death ; that upon this advice and with the intent to provide for the defendant in the event of his death, complainant signed the deed that they had prepared for him ; that complainant recovered from his illness and thought no more of the deed until he learned that it had been recorded ; that defendant continued to manage the property as she had done during his illness and minority, the complainant being sickly and not accustomed to business.

The bill prayed that defendant deliver the deed for cancellation and account for receipts and disbursements concerning the property.

The answer admitted that respondent was a member of the household of complainant's father, and in answer to the allegation that respondent stood *in loco parentis* to complainant averred, "I would not say that I stood *in loco parentis* to plaintiff, his father having lived in the family until plaintiff was over nineteen years of age." The answer denied the other material allegations of the bill and averred that complainant executed the deed well knowing that it was a deed, and that it was to take effect as a deed ; that plaintiff was as well on the day it was executed as he generally had been, and if there was any difference, was better than usual; that complainant gave her the deed ; that after he gave it she asked John Baum in his presence if it was necessary to have it recorded. Mr. Baum replied that is just as it pleases you, that it was not necessary to record it immediately ; that complainant then said he would rather not have it recorded at present, as everybody would know their business, but that there was no agreement that it should not be recorded ; that the deed was prepared by complainant himself and that he wrote it with his own hand; that he delivered it without any request on respondent's part. Respondent admitted that she had continued to manage the property.

The cause was referred to J. M. Woods, Esq., as Master, who reported *inter alia* as follows :

"Mary A. Bailey, the defendant, came into the family of Dr. T. A. Worrall just a short time after C. A. Worrall, the plaintiff, was born, and she continued there as one of the family, and according to the testimony, acted in the capacity of a sister or mother, C. A. Worrall's mother having died a short time after he was born. Mary A. Bailey occupied this relation until the time C. A. Worrall removed to Philadelphia, in October, 1881.

"Clarence A. Worrall became of age the seventeenth day of March, 1879, and on the twenty-third day of April, 1879, made a deed of the property in dispute to the defendant Mary A. Bailey, this deed being the one in dispute. The plaintiff

does not deny that he made the deed and that it was properly executed, but claims that the deed was to be as and take the place of a will, and not to take effect until after his death, and for this purpose the plaintiff himself is called and swears that 'there never was a time that he did not know Mary A. Bailey and that she was as a mother to him. That there had been frequent conversations between himself and the defendant previous to the date of the execution of the deed. . . . . That at one time she told him that he must make a will in her favor on his becoming of age and she would do the same for him. He does not remember how often she said this to him. She said this course would avoid further trouble after his death.' . . . . That John Baum was present at some of these conversations.

"The plaintiff also swears that when it was agreed upon to make a deed instead of a will, and that the deed was to be in the place of a will and not to take effect until after his death, and that after he had signed the deed he handed it to her and told her to put it among his papers. To corroborate the plaintiff they have called Mr. Steinbarger, who swears that at one time he had a conversation with the plaintiff and defendant, in the presence of Henry Dupert, about digging a well on the farm (part of the property included in the deed in controversy). Mr. Steinbarger says that he went in to see the defendant and plaintiff about the well, and the defendant said, 'whatever he does I am satisfied.' She also said to me, after I dug the well to twenty feet, when I came in she said 'it was the young man's property and whatever he agreed to she was satisfied with.' Mr. Steinbarger thinks the conversation took place about the last of August, or in September, 1879. On cross-examination the witness stated that they went into the office to see Clarence and that he (Clarence) requested them to go in and see Miss Bailey, and she said to the plaintiff 'you know you have not got the money to go on at them prices.' The plaintiff then calls Henry Dupert, who states that he was present at the conversation. He says: 'I was present at one time, but don't recollect of anything being said as to whose property it was;' and further states as follows: 'I don't recollect whether Clarence told Steinbarger, the day we were inquiring about the well, to go in and see Miss Bailey, and what she said would be right. Clarence left a good deal with her. He often referred me to Miss Bailey,' etc.

"Mr. A. B. Fowler is then called, and states that he made an agreement with C. A. Worrall, in 1881, to take lumber off of this farm, but that he had lost the agreement. On cross-examination he stated that he thought Clarence wrote the agreement himself, but that Miss Bailey was there and helped

make the bargain before it was written.   The plaintiff proceeds
further, and calls Joseph Williams, James Smith and William
Johnson, who produce a number of receipts for rent on the
property in dispute, signed by C. A. Worrall, and also a num-
ber of agreements.   The agreement, however, of Henry Du-
pert, is dated April 14th, 1879, and the date of the deed in
controversy is April 23d, 1879.

   " To further corroborate the plaintiff's testimony, they have
produced a number of letters written by defendant to plaintiff,
in which she refers to the property as ' ours,' ' the home,' etc.,
etc., and in one letter, in answer to a request of the plaintiff
for money, she said : ' If I sell the farm, I will send you the
proceeds.'   Her letters to him show that she at different times
did send the plaintiff money, but, in the Master's opinion, she
in no instance contradicts her testimony, and there is nothing
in any of her letters to induce the Master to believe she recog-
nized the property as being any person's but her own.   On the
other hand, the letters of the plaintiff to defendant, produced
by the defendant and plaintiff, go to show that he (the plain-
tiff) considered the homestead as belonging to defendant.   In
his letter to her, marked ' Exhibit 2,' he writes : ' Now Mamie
about the home I want you to make a deed of that or a will
immediately, so that in case anything should happen to you the
home shall come back to me or my heirs, of course that was
the arrangement, or in case you marry—these things had bet-
ter be attended to at once.'   And in letter marked ' Exhibit
4,' ' besides giving you the home your lifetime,' etc., . . . .
' You have a comfortable home, and the income from it suffi-
cient to live on, while I have no home and nothing,' etc., and
in letter marked ' Exhibit 5 ': ' You have a home and will not
need it, but I will need every cent I can get and will have to
work far harder than ever I expected to make both ends meet,'
etc.   In his letter marked ' Exhibit 9 ': ' Well now we will see
how the case stands; you have the house a home as long as
you live—of course at your death it comes back to me as you
agreed, and I know you will be just and honorable to me &
mine—you will have the rent of the offices to live on,' etc.

   " These statements in plaintiff's letters, that the property
was to revert back to him at her death, can consistently be
referred to the fact that the defendant did make a will as tes-
tified to by Mr. Baum, devising all her property to plaintiff
after her death, and to contradict the plaintiff's testimony, that
the deed was to be a will and not to take effect until after his
death."

   The other material facts of the case appear in the opinions
of the courts below and above.

   The Master further reported that the denials in the respon-

dent's answer of so much of the complainant's case as related to the deed being a will were responsive to the corresponding allegations of the complainant and were therefore conclusive on the complainant in the absence of corroborating circumstances. The Master also reported that the deed being an executed contract could not be rescinded except on proof of fraud or mistake ; that the burden of showing fraud was on the complainant and that he had failed to do so, and that the bill should be dismissed.

Exceptions to this report were dismissed by the Court, BUCHER, P. J. delivering the following opinion : Fourteen errors have been assigned to the report of the Master. It will be unnecessary to pass upon them *seriatim.* The Master has found that the plaintiff executed the deed in question, well knowing what he was doing, and the nature and effect of the instrument, and without the coercion or persuasion of the defendant, but of his own free will. Is this true ? There is certainly nothing in the evidence which shows that plaintiff was coerced into signing the deed. Did he know its legal effect ?

According to all the proof he knew it was a deed, conveying the real estate therein mentioned, and was intended to avoid the collateral inheritance laws, which it could not have done unless it took immediate effect : Reish *vs.* Commonwealth, 10 Out., 521 ; that it was to make title instead of doing the same through a devise by will ; and he certainly knew that the grantee would get title by virtue of the deed. But did plaintiff and defendant understand that this deed should *in fact* operate as a will ? On this point the plaintiff swears that he so understood and so intended the deed in question to operate.

The fifth paragraph of his bill says : On 25th April, 1879, while I was so seriously ill that it was believed by myself and others that I should not recover, I was solicited by the defendant to make a will in her favor, which I was willing to do. She then sent for one John Baum, Esq., and consulted with him, after which they both urged and advised, that instead of making a will I make a deed to her, said deed to take the place of a will, and to be treated only as a will, and not to be given to her or recorded until after my death. Defendant's answer, being responsive to the bill, denies every allegation therein contained. John Baum swears that on the 23d April, 1879, he advised plaintiff to make a deed to defendant, instead of making a will in her favor ; that plaintiff said that as he had things in his own right now, he was going to do for Mamie what his father neglected to do ; that he had not made, in his opinion, ample provision in his will for the services she

had rendered, and asked me what I thought of it.   I told him that I thought the same.   Some ten days after, the plaintiff called Baum in, and told him that he had the deed written, and wanted to have it acknowledged.

Then afterwards Coplin and Baum went to plaintiff's house, and plaintiff signed the deed, and Baum witnessed it, which plaintiff then handed to the defendant, and said, " There, Mamie, that makes you all right."

Nothing more was said.   Baum says that between six and nine months after this deed was executed, plaintiff and defendant both spoke of making wills in each other's favor.

Plaintiff asked him about what would become of the property deeded to defendant if she died without making any disposition of it.   Baum said it would go to her friends. Plaintiff said that he and defendant had reached the same conclusion, and plaintiff and Baum went in to see the defendant, and she said that she wanted to will all her real and personal estate to plaintiff, and she wanted her will made, in case anything did happen her. She was then sick ; Baum then prepared both their wills.   And he further says that defendant never requested him to make a will or deed, except the will just mentioned; that she never requested him to get plaintiff to make any deed in her favor.

Then the fifth paragraph of plaintiff's bill rests upon no other testimony than plaintiff's own oath.   And he is seriously contradicted by Baum as well as defendant.   So that defendant is sustained in her answer by the disinterested evidence. The plaintiff's sixth paragraph is responsively answered by defendant and the facts stated therein denied.   The denial of the defendant is also sustained by Baum so far at least as to that part of plaintiff's allegation which alleges that he handed defendant the deed after its execution, and asked her to put it in the vault with his other papers, and leave it there unless he died.

Baum says that he handed the deed to the defendant and said, " There, Mamie, that makes you all right."   This testimony, under the equity rules, seems to set at rest the allegation that this deed was to operate as a will and revocable during the life of the plaintiff.   Surely under this condition of the evidence this deed could not be pronounced a will.   In aid of the will theory plaintiff has introduced into the case such facts as these, namely:   That A. B. Fowler contracted for lumber leave in May, 1881, with the plaintiff on land conveyed by plaintiff to defendant by the deed in controversy. But the witness says that the defendant was in and out while the bargaining was going on, and knew what they were contracting about and helped to make the bargain, before it was

written. That William Johnson and James Williams occupied rooms in the house, and that they rented from both plaintiff and defendant in 1879; from April, 1879, eleven receipts for rent were signed by the plaintiff to Johnson and some to Williams, but some were signed by defendant.

Steinberger proves that about September, 1879, while digging a well on the farm conveyed, he struck rock and was unwilling to go on at the rate paid. That defendant said it was the young man's property, and whatever he agreed to she was satisfied. But in cross-examination he says the plaintiff told him to see defendant, and when they went to her plaintiff said to defendant, This man has got on a rock, and he cannot go any farther at that price. And he talked the thing over at the price wanted, and she said you know you have not got the money to go on at them prices. Dupert, another witness, attempts to give the same occurrence, being present, but does not recollect of anything being said as to whose property it was; and further says that he don't recollect with whom he made the bargain to dig the well, and that both plaintiff and defendant were there when they came to see about going on.

The correspondence which passed between the parties after the date of the deed has been given in evidence, which, however, leaves the matter in equilibrium, and expressions such as "our property" and "we" and "us" used by the parties in speaking of property mean nothing, in view of the fact that the parties still lived together after the deed was made, much as they had done before, and had acquired the habit of speaking of their several properties as if they were common to both. No expressions of this kind could overthrow the most solemn instrument known to the law as an assurance of title to real estate.

We therefore agree with the Master that this deed was not intended to operate as a will, but was in truth and in fact intended to convey the real estate therein mentioned absolutely.

We now come to the real question involved in the case, namely: was this deed executed and delivered under circumstances and a relation which brings it under the recognized rule that equity protects "parties against the effect of overweening confidence and self-delusion, and the infirmity of precipitate judgment."

This rule is generally more readily and frequently applied and enforced when there is some peculiar confidential or fiduciary relation between the parties with some intermixture of imposition, overreaching unconscionable advantage, or other mark of direct or positive fraud. It applies between parent and child, brothers and sisters, guardian and ward, trustee and

*cestui que trust,* doctor and patient. Where the relation of the parties is such that undue influence might have been exercised, it must then be shown that the disposition of the donor was not produced by undue influence : Wistar's Appeal, 4 Smith, 60; Greenfield's Estate, 2 Harris, 489; Kline *v.* Kline, 7 Smith, 120; Spencer's Appeal, 30 Id., 317; Cooke *v.* Lamotte, 15 Beavan, 234; Story's Equity, 12th ed., 307.

Now, then, did the defendant Mary Ann. Bailey stand in any blood relation to the plaintiff Clarence Worrall? She was neither sister, mother, aunt, nor cousin, nor of the remotest kin. She had come into the family of plaintiff's father when about fifteen years old, and four months after the plaintiff was born, and was taken into the father's family to be a companion and assistant to the plaintiff's little sister. The mother of the plaintiff then lived.

She died in August, 1863, five years after defendant came into the family. The father of plaintiff died in October, 1877, when plaintiff was nineteen years old. The defendant was nurse to the plaintiff in his infancy and after the death of his father, continued to live in the same homestead with plaintiff, and being an active woman and he not generally healthy, she naturally attended to both the household and sometimes to the business of the plaintiff. She had been provided for by the will of plaintiff's father, and this was her compensation for past services, which she accepted. She admits that the *feelings* of both sister and mother went out toward the plaintiff, and this was the extent of the relation.

To bring the case within the equity rule above cited, she being of no kin whatever to the plaintiff, the relation must spring from that commonly called "*in loco parentis,*" viz. in place of a parent; as the master stands towards his apprentice *in loco parentis.* It means where one not a parent takes the place of a parent, provides for and does that for a minor which the parent ordinarily does—feeds, clothes, educates, and trains and cares for the minor just as a parent does for his own child. It implies dominion and authority over the child, in fact, just as the parent and guardian exercises the same authority by law; it implies that the child is under the influence, guidance, and governed by the advice and opinion of the *loco parentis* just as it would be were the relation actual. It is when the *loco parentis,* thus influences, guides, and moulds the thoughts, and opinions of the child, that the law, seeing the authority is as potent as in the natural relation, applies the same rules of accountability as are applied in the actual relation of parent and child, guardian and ward.

Now, was this the relation between the plaintiff and the defendant? We are not able to say so. Living in the same

house and presiding over the household, and assisting him in his business, attending to his wants when ill, and doing other acts of charity and necessity for him, do not even in a slight degree establish the relation as ordinarily defined in practice and precedent *loco parentis*. It is quite certain that these parties were living under the glow of ardent friendship and affection. But then this is the expected relation when voluntary gifts are made. Enemies do not bestow bounties on each other, nor are voluntary gifts the result of general and ordinary relations, but have their origin in tried affection and warm impulse; so that no gift could endure the test, if it were only valid; where all attachment, love, and affection were absent none could be made under such exactions.

There was no technical trust relation between them, simply that relation which results from living in the same house, a desire to assist each other by acts of friendship. The fact that defendant received the funds of plaintiff and disbursed it for the benefit of the household only proves that she was the servant or employee of the plaintiff, and this is certainly no trust relation. We are not convinced that the learned Master has erred in his findings, and concur with him in his conclusion that the bill should be dismissed. Nothing remains save to make the proper decree.

And now, March 26th, 1885, all the exceptions to the Master's report are overruled and his report is confirmed absolute; and it is further ordered, adjudged, and decreed that the bill of complainant be dismissed, and that the complainant Clarence A. Worrall pay all the costs of the proceeding.

From this decree complainant then took this appeal.

*Josiah R. Adams* (with whom were *Lyman D. Gilbert* and *Elder & Son*), for appellant.—The relations of the parties were such that equity will require proof of good faith from the gainer in the transaction. Authority of one over the other is not the test, it is confidence reposed. The rule applies to uncle and nephew; 2 Dev. & Beat. Eq., 241. To brothers and sisters: 2 Selden, 268. To grandson and ward. To persons standing in the relation of *quasi* guardians: Story, Eq. J., § 319; to trustee and *cestui que trust*, to attorneys and solicitors, Greenfield's Est., 14 Pa. St., 489; to agents: 1 Story Eq. Jur., § 315; to medical adviser and patient: Dent *v.* Bennett, 4 My. and Cr., 277; to servants: Osmond *v.* Fitzroy, 3 P. Wms., 129; Whitehorn *v.* Hines, 1 Munford (Va.), 557; to principal and surety: Id.; to partners in business: 1 Story Eq. Jur., § 323; to persons about to marry, when the deed is not known to both: Duncan's Appeal, 43 Pa. St., 67; to ante-

nuptial contracts between persons about to contract marriage: Kline *v.* Kline, 57 Pa. St., 120; to transactions with persons who are excited by liquor: 3 Lead. Cases, Eq., 135–6, 3 Am. ed.; to transactions with habitual drunkards: Id., 136; to transactions with persons whose minds are weakening with age, although still *compos mentis:* 58 Pa. St., 477; or by sickness: 3 Lead. Cases, Eq., 138; to cases of supposed friendship: Id., 139.

The Pennsylvania cases are equally clear: Wistar's Appeal, 54 Pa. St., 60; Persch *v.* Quiggle, 57 Pa. St., 247; Spencer's Appeal, 80 Pa. St., 317; Darlington's Appeal, 86 Pa. St., 512.

The question is not what was complainant's intention in signing the deed, but how was that intention produced. The circumstances including the way the parties acted toward the property show that it was meant as a will.

*A. Reed* (with whom was *A. W. Porter*), for appellee.—The master having found as a fact that plaintiff executed the deed well knowing what he was doing and the nature and effect of the instrument, without coercion or persuasion of the defendant, and that no undue influence was used, the Supreme Court will not set aside the finding, especially when confirmed by the court below, except for plain mistake: Bull's App., 24 Pa. St., 286; Dellinger's App., 71 Pa. St., 425; Packer *v.* Noble, 7 Out., 188; Fahnestock's App., 8 Out., 46. Even if true that the deed was improvident, gross inadequacy of price is no ground to set aside an executed contract: Davidson *v.* Little, 10 Harris, 245; nor when combined with improvidence, surprise and hardship: Graham *v.* Pancoast, 6 Casey, 89; Nace *v.* Boyer, 6 Casey, 109; Rockafellow *v.* Baker, 5 Wr., 319; Custard *v.* Custard, 25 Texas, (Sup.) 49. The rule contended for by appellant applies to those who have the charge of another's person or estate. Till plaintiff was of age trustees under his father's will had charge of his property. There was no evidence that in the twenty-eight days that intervened appellee did anything to acquire any control over the appellant. The only fiduciary relation shown to exist was that of being brought into the family as a companion to complainant's · sister, taking care of complainant. Huguenin *v.* Baseley, 14 Vesey, Jr., 273, relied upon by appellant was a settlement by a widow on the agent who had secured charge of her property by fraud. In Osmond *v.* Fitzroy, 3 P. Wms., 129, the complainant was of weak intellect and the respondent had been appointed his agent to keep him from being imposed upon. See the note to that case where the Lord Chancellor is reported to have said no relief would have been granted, except that the court considered Lord Southamp-

ton more liable to imposition than the generality of mankind· In Whitehorn *v.* Hines, 1 Munford, Va., 557, a conveyance was made by one of notoriously weak mind. There is nothing in the relations of medical adviser to patient that forbids a gift from the patient: Audenreid's App., 8 Norris, 114; so between partners: Geddes' App., 30 P. F. S., 442; and between parent and child: Bispham's Equity, 235; Jenkins *v.* Pye, 12 Pet., 241.

Mr. Justice Trunkey delivered the opinion of the Court, October 5th, 1885.

If it be true that between these parties, at the time and prior to the execution of the deed, there was "simply that relation which results from living in the same house, a desire to assist each other by acts of friendship," the plaintiff has failed to establish his claim. This is the view of the learned judge of Common Pleas. The Master finds that "there did exist a very close relation between the plaintiff and defendant," but omits to state what that relation was; and he further finds that the plaintiff executed the deed, well knowing what he was doing, without coercion or persuasion or fraud on the part of the defendant, and that the defendant did not misuse the confidence reposed in her by the plaintiff. Both Master and court treated the pleadings and evidence as if the parties had been to each other as strangers, and that the burden of proof rested on the plaintiff to show actual fraud by the defendant as essential to the making out of his case. If there was such confidential relation between the parties, in connection with the admitted facts, as casts the onus on the defendant to prove that the transaction was fair and conscionable, the court erred in dismissing the bill.

The deed is nominally for consideration of fifteen dollars, for real estate worth thirteen thousand dollars; it was in fact a gift to the defendant of the major part of the estate which the plaintiff owned at the date of the deed, made within a few days after he became twenty-one years of age. It is averred in the bill that the plaintiff was so seriously ill when he executed the deed that it was believed by himself and others that he could not recover; and when he recovered he thought no more of the deed until he heard it had been recorded, and that she continued to manage as she had done during his illness and minority; these averments are not specifically denied in the answer. The seventh paragraph of the bill is virtually admitted; and of the averment in the fifth relating to the plaintiff's illness the answer says, "that plaintiff was as well on that day —the day he executed the deed—as he generally had been, and, if any difference, was better than usual." Neither in de-

fendant's answer nor testimony is it alleged that she or anybody else believed he would recover. The bill also avers that the defendant stood *in loco parentis* to the plaintiff from his earliest infancy, and that she had his implicit confidence; her answer does not deny this, merely stating that she would not say she " stood *in loco parentis* to plaintiff, his father having lived in the family until plaintiff was over nineteen years of age."

The defendant testifies that she became a member of Dr. Worrall's family when she was fifteen years old, and Clarence was four months of age; within five years thereafter his mother died, having never been able to care for him, and when he was nineteen years old his father died; that during his childhood she wheeled him about in his baby carriage, carried him about nights, and taught him his letters; that her feelings toward him as a mother were very strong; that his health from the time he was fifteen years of age to the time he executed the deed, was "sometimes good and sometimes very poor, more often very poor for awhile;" that after Dr. Worrall died Clarence required a great deal of attention, she waited on him nights, he could not wait on himself, he was sick a great deal and required more attention than when he was a baby, and she attended to his necessities; that they had frequent conversations about the deed previous to its execution when no one else was present, and in these conversations he told her that as soon as he had his affairs in his own right he would fix things all right for her as far as the home and farm were concerned, for what she had done for him; that she heard him ask Baum the difference between a deed and a will; and that after she received the deed she continued to manage the property as she had done before.

Their correspondence shows that in their relation, while they lived together, hers was the master mind; that she controlled and managed the property left by Dr. Worrall; that the sickly young man had confided in and depended on her, and that she had exercised a motherly care and influence for and over him. When his health became better and he left her home, he was a novice in business, greatly lacked knowledge as well as experience and often made piteous appeals to her for pecuniary aid. She responded by sending him small sums of money as she could spare from her income, articles for his house, and by efforts to raise money out of the remnant of his property which he had not conveyed to herself. All along she had a most tender solicitude for his welfare, and gave him much advice respecting the conduct of his business; but she took care not to lose her hold on the property described in the deed. She always expressed warm affection and interest. At the last, when he demanded a reconveyance, she reminded him of the many

weary nights she had carried him while he was choking with croup, of the long years of affection of the only mother he ever knew, which affection would not be buried until the grave should shut up her poor body, and that she had been true to her trust; but she declined to reconvey, saying: "As matters stand it makes you no poorer and me no richer and you will eventually get it all anyhow if you live. I have no one to take a dollar from you and if I had they would not get it. You do not know what the home may have to do."

Prior to the execution of the deed, the only person who talked with Clarence on that subject, besides Miss Bailey, was John Baum, who was one of the executors of Dr. Worrall's will, and a man of intelligence and good repute. Baum testifies that he had but one conversation with Clarence about the deed before its execution, and none afterwards; that Clarence thought his father had not made ample provision in his will for the services of Miss Bailey and asked him what he thought of it, and he replied that he thought the same; that Clarence asked the difference between a deed and a will, which he (Baum) explained, and advised him to make a deed; that Clarence said he wanted her to have it without having to pay the collateral tax, and "I said to him that if he wanted to do the fair thing to her he ought to deed it to her, that that is what I would do."

The deed was acknowledged before W. V. B. Coplin, the recorder, at Miss Bailey's house, on April 25th, 1879; Coplin knew nothing of its contents. It was recorded on December 12th, 1881. For over two years none but the parties and Baum knew of the existence and contents of the deed. Clarence borrowed $500, for which he gave judgment, which fact coming to the knowledge of Miss Bailey she felt that he had deceived her, and she immediately had the deed recorded. Some months after the execution of the deed, each party made a will in favor of the other.

Dr. Worrall devised certain real estate to Miss Bailey in lieu or stead of any and all her claims for services rendered during the time she lived in his family; and she was satisfied for such services. Baum's testimony reveals first, that Clarence was prepared to give the property to Miss Bailey before Baum was sent for, and, secondly, that Baum advised him altogether in favor of her interest. There is no evidence of a conspiracy, nor of actual fraud. Baum may have believed that Clarence was at death's door, and that she, for her motherly care of him, should be the first and chief object of his bounty. The deed is not in Baum's handwriting—he had not time to write it—he only had time to buy two blanks and write the description of the

property in one, which enabled Clarence to fill out the other. Months after he had time to write a will for each.

The foregoing facts are shown by the pleadings, the testimony of Miss Bailey and of her witness, Mr. Baum. That the plaintiff knew at the time that he was giving her a deed is clear; he inquired of Baum the difference between a deed and will and that was explained to him; he wanted to save her from collateral inheritance tax, and Baum told him the only way to avoid the tax was to make a deed, and strongly advised the making of a deed. It is uncertain whether Miss Bailey or Clarence sent for Baum; probably both knew he was sent for, but Clarence, sick and believing he would not recover, confiding, weak and plastic, was already prepared to vest the property in Miss Bailey, and Baum said nothing to induce reflection or change of purpose—he said much to induce the absolute transfer of the title.

The defendant refers to the rule that, except for plain mistake, this court will not set aside the Master's finding of fact, especially when that finding has been confirmed by the court below. In a suit in equity the finding of a Master is not conclusive, as is the verdict of a jury in a trial at law. Upon exceptions to the Master's findings of fact the court of original jurisdiction is bound to examine the evidence and determine what are the facts. Whether that court agrees or disagrees with the Master's findings on appeal the appellate court shall in like manner determine if the facts have been rightly found. When the appellate court is satisfied that facts have been found without proof, or material facts established by the proofs have not been found, it follows that there has been plain mistake. In the several stages of the proceeding there is no place for a perfunctory consideration of the evidence relative to facts in dispute.

Miss Bailey well understood her past relation to Clarence when she made answer and when she testified. It is true, as remarked by the court below, that "living in the same house and presiding over the household, and assisting him in his business, attending to his wants when ill and doing other acts of charity and necessity for him do not even in the slightest degree establish the relation as ordinarily defined in practice and precedent *in loco parentis.*" But these acts are evidence to be considered with other evidence in support of the allegation that the person who performed them is the only mother the boy ever knew, and acted as a devoted mother during many years of his sickness, and that she had good understanding and business capacity, and had acquired dominion and influence over him to the full measure of a natural mother's over her son. If the defendant's answer be understood as a denial

of the relation, the evidence establishes it. She had not the power of his father, nor would his mother have had if she had lived. Is a mother's influence over her son less than the father's because she has less legal power and less physical strength? What could Clarence's mother have done to inspire his confidence and guide and mould his thoughts, that was not done by Miss Bailey? We think it is clearly proved that these parties stood in the relation of parent and child.

At the date of the deed Clarence's health had been poor for over six years, and after his father's death Miss Bailey had been his sole attendant. She had often talked with him alone about the deed and he executed it very soon after his majority. None but themselves and Baum knew its contents, and Baum, urging him to make a deed instead of a will, failed to advise him to consult counsel, or to communicate with his kindred; nor did he inform him that he could make a deed in trust, either with or without the power of revocation, reserving a part or the whole of the income for his own support. For more than two years after the making of the deed the parties and Baum were the only persons who knew its contents, and during that time there was no ostensible change in the ownership of the property. In the answer there is no pretence of consideration for the deed. Clarence believed that his father had not sufficiently compensated Miss Bailey for her services. Baum said he thought the same, and she did not inform him otherwise. The deed was for the greater part of the grantor's estate, and the remnant was inadequate for his support. Surely the circumstances, as admitted by the defendant, and testified by herself and Mr. Baum, *prima facie* reveal constructive fraud, springing from the confidential relation between the parties. Therefore the rule applies, that the burden rests upon the grantee to show that the arrangement was fair and conscientious.

Where a deed of trust was executed to four trustees who stood in a fiduciary relation to the grantor, with a provision that the trustees should be paid forty thousand dollars for their services, a sum equal to one fifth of the grantor's estate, although there was no proof to justify a charge of actual fraud, the beneficiaries having failed to expressly show that the arrangement was fair and conscientious, beyond the reach of suspicion, the provision was declared void and struck out of the deed : Greenfield's Estate, 14 Pa. St., 489. It was there said that the rule is founded upon a motive of general policy, and is designed to protect a party, so far as may be, against his own overweening confidence and self-delusion, the infirmities of a hasty judgment, and even the impulse of a too sanguine temperament; that in enforcing the rule courts of equity act

irrespective of any admixture of deceit, imposition, overreaching, or other positive fraud; and that the rule has been beneficially applied to those confidences which owe their birth to the relation of parent and child, guardian and ward, as well as attorney and client. In the late case of Miskey's Appeal, 11 Outerbridge, 611, the authorities are reviewed by Justice GREEN, sustaining the doctrine that when the relation of parent and child exists, with facts throwing suspicion upon the fairness of the transaction between them, the burden of proof is cast on the party who seeks to support it, to show that he has taken no advantage of his influence, and that the arrangement is fair and equitable.

The plaintiff, sick and under the exclusive care of the defendant, was ten days filling up a blank, although another blank was furnished with description of the property written therein, so that his work was merely copying. He intended to make a deed, for Baum had told him the difference between a deed and a will, and he wanted to save the beneficiary from a tax; but the question is, how was that intention produced? It has been remarked that influence is assumed between parent and child, and it is then thrown upon the parent if he takes any benefit, to prove what is called the righteousness of the transaction, that the court may see that every proper protection was thrown around the child, and that the child acted advisedly and deliberately. Parental influence is not terror and coercion, but kindness and affection which may bias the child's mind and induce the child to do that which may be highly imprudent, and which, if the child were properly protected, he would never do: Turner *v.* Collins, Law Rep., 7 Ch. App., 329.

In Greenfield's Estate, *supra,* it was said: "Where the question agitated is a gift, the rule would seem to be more stringent than where the advantage flows from a contract or mutual arrangement." And stronger proof is necessary to raise a suspicion or presumption of undue influence in case of a will than in that of a deed or contract; a grant of all that a man has without a return or equivalent, or a contract marked by gross inadequacy of consideration, being at least *prima facie* evidence of fraud on one side, or folly or ignorance on the other, which cannot be said of a gift by testament, even when the relations of the testator are passed by in favor of strangers: 3 Lead. Cas. in Eq., 145.

There is nothing in the relation of parent and child, or other near relation, to preclude one from accepting a benefit from the other in the shape of a gift, or of a contract upon more advantageous terms than would have been granted to a stranger, and the fact that such a gift has been conferred, or contract made, will not warrant an inference that it has been procured

by undue influence. Unless there is something suspicious in the circumstances, or the nature and amount of the gift is such that it ought not to have been accepted even if freely tendered, the donee will not be called upon to show that the transaction was in all respects fair and honest, and in no respect tainted by fraud or undue influence: Id., 144.

In this case not only the nature and amount of the gift, but the suspicious circumstances, call upon the donee to prove that the transaction was fair and honest, and that the deed was not procured by undue influence. Testimony to establish this is wanting.

> It is considered and decreed, that the decree dismissing the plaintiff's bill, with costs, be reversed. That the deed dated April 23d, 1879, by the plaintiff, Clarence A. Worrall, to the defendant, Mary A. Bailey, is void, and that the said defendant, within thirty days after notice, reconvey the property described in said deed to the said plaintiff, so as to vest in him such title on its face, as he held at and immediately before the delivery of said deed. That the said defendant shall account for all receipts and disbursements concerning the property described in said deed. That the appellee pay the costs of appeal. That the record be remitted for enforcement of this decree, and further proceedings.

GORDON and CLARK, JJ., dissent.

Subsequently a petition was presented for a modification of the above decree. The opinion of the court was filed November 9th, 1885.

PER CURIAM: And now upon consideration of the petition for modification of the decree, and the answer thereto, it is adjudged and ordered that the time for delivery of the deed be extended until final decree upon the account, or until final disposition of the cause, on condition that the defendant, Mary A. Bailey, permit the plaintiff to collect and receive all the rents accrued and unpaid by the tenants, and all rents to accrue on the lands, and, if necessary, to use her name as legal plaintiff in collection of the same, and so that the plaintiff shall have the income of the lands during further proceedings in this cause; and upon violation of the condition this extension to terminate.