## THAW v. THAW.

Circuit Court of Appeals, Second Circuit. July 2, 1928.

No. 354.

1. **Gifts ⬥49(2)—Evidence held to require cancellation of gift by grandmother to grandson on ground of undue influence, overreaching, and unconscionable advantage.**

Evidence in suit to set aside a gift by grandmother to grandson, and for an accounting of proceeds thereof, *held* such as to require cancellation on ground of undue influence, overreaching, and an unconscionable advantage, and taking advantage of confidential relationship existing between parties and failing to exercise good faith and fair conduct.

2. **Gifts ⬥47(3)—Aged woman, making gift to grandson, need not, to secure relief in equity, establish insanity or mental condition rendering her entirely incapable of executing valid gift.**

Aged woman, making gift to grandson at time she was suffering from ill health and was mentally weak, need not, in order to secure relief in court of equity, establish insanity or mental condition rendering her entirely incapable of executing a valid gift.

3. **Gifts ⬥38—Confidential relation between parties to gift requires candor in communication and dealing, and fairest and fullest explanation.**

Where confidential relation exists between parties to gift, duties involved require candor in communication and dealing, and the fairest and fullest explanation to and with person so trusted; otherwise, it is against good conscience, and it is peculiarly within province of court of conscience to set aside such gifts.

4. **Gifts ⬥47(3)—Gift from older member of family to younger member in confidential relation is presumptively invalid.**

Where a younger member of the family is also in confidential relation, a gift from an older member of the family is presumptively invalid.

5. **Gifts ⬥38—Person in whom confidence or trust is reposed must make fullest and fairest explanation, to establish gift from donor who trusted him.**

Wherever there exists such a confidence as enables person in whom confidence or trust is reposed to exert influence over person trusting him, court will not allow any transaction between parties to stand, unless there has been the fullest and fairest explanation and communication of every particular resting in breast of one who seeks to establish gift from donor who trusted him.

Appeal from the District Court of the United States for the Southern District of New York.

Suit by Mary Copley Thaw, by Matthew C. Fleming, her guardian ad litem, to set aside a gift and for an accounting of the proceeds of that gift. Decree for defendant, and plaintiff appeals. Reversed.

David A. Reed and James' G. Marks, both of Pittsburgh, Pa., and Matthew C. Fleming, of New York City, for appellant.

Taylor, Knowles & Hack, of New York City, for appellee.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

MANTON, Circuit Judge. This appeal brings into question a decree denying relief the appellant sought against appellee to set aside a gift made to him of $600,000 on the ground of undue influence, overreaching, and unconscionable advantage. She was advanced in age and in extreme physical and mental weakness. The appellee is also charged with taking advantage of a confidential relationship existing between them and failing to exercise good faith and fair conduct toward her. Since the trial below, because of the mental condition of the appellant, a guardian ad litem has been appointed to prosecute this appeal.

The appellant is appellee's grandmother. She was at the time of the gift, January 5 and 6, 1925, 83 years old and in failing health. She had suffered from frequent attacks of exhaustion in 1924 and had permanently engaged a trained nurse, and had a companion for many years prior thereto. In December, 1924, she became ill with an exhaustion attack, which developed into pneumonia on December 18, and she remained under the doctor's care until January 15, 1925. From December 18 to 21 she was in a heavy coma and could not be aroused. On January 5, 1925, she was still in bed, but convalescing, and still suffering from exhaustion. January 7 was the first time she left her bed, when she was lifted into a wheel chair, but was too weak to walk or read. At that time she was unable to remember the events which transpired between Christmas and New Year's. She went downstairs for the first time on February 19, 1925. Her husband died many years previous, leaving her with five children, all living, except one, who was the father of the appellee, and who died May 17, 1924. During this illness, none of her children was at her home in Pittsburg. At this time the appellee was 26 years of age, a college graduate, and engaged in the brokerage business in New York City. He had been assigned to Pittsburg territory in 1924, and spent about 2 days a week in that city, and on these occasions visited his grandmother and discussed with her frequently her financial affairs, eventually becoming her advisor, and he agreed to accept from her a power of attorney,

giving him full authority in the matter of her investments. Her estate at this time had a net market value of $3,178,643.88, consisting of stocks in various Standard Oil Companies.

The court below found the appellee precocious and developed in mind and personality beyond his age. On the death of his mother in 1915, he came into possession of nearly $442,000, under a settlement his father made with his mother from whom he was divorced. Under his father's will, he received a legacy of $50,000, and he had other sources of income amounting to approximately $30,000 annually, in addition to the salary of $12,000 which he earned.

[1] Because of the reference made at the trial and on this argument to appellee's father's estate, it will be necessary to briefly state appellee's relation to it. He died, having been married and divorced twice. He had a son by each marriage; the appellee was born of the first. His father created a trust fund for the benefit of Frieda Marsh Thaw, his mother, and appellee, the corpus of which vested absolutely in the appellee upon his mother's death in 1915, subject to his then minority. In March, 1923, his father entered into a separation agreement with his second wife, Jane Thaw, and gave her $110,000 in securities absolutely, and created a trust of approximately $550,000 for her benefit for life, and the remainder to a son, Edward Thaw, Jr. This was subject to certain payments to other relatives of Jane Thaw. In his father's will he referred to his having theretofore made provision for the appellee, apparently as a reason for devising to him only $50,000. His residuary estate, amounting to $892,000, was held in trust for his widow and her son, Edward Thaw, Jr.

Under this will, Edward Thaw, Jr., receives no corpus until he arrives at the age of 30 years, when he will receive $223,000 (1939). Upon his mother's death, but not until 1939, he will receive approximately $275,000, but he receives no income until 21 years of age. Between the ages of 21 and 25, he will receive the income of $223,000; between 25 and 30, the income from $446,000; and after he arrives at the age of 30, and until the death of his mother, he will receive the further income on $167,200. After his mother's death, he will receive the income on $669,000, with power of appointment. The appellee was dissatisfied with this will. He and his father had been estranged, but he testified that just prior to his death they had become "quite close," and his father

"intimated to me on more than one occasion that on his death I would be wealthy." He consulted counsel as to his status under the will and separation agreement. He finally convinced Mrs. Jane Thaw that it would be equitable for him to receive $210,000 from her interest over a period of years to equalize the difference between the amount she received under the separation agreement and the amount his mother had received under her separation agreement.

The court below found the relationship between the appellant and appellee to be "one of such high trust and confidence that there was a duty on the part of the defendant, not only to refrain from any false or misleading statements, but also to warn the plaintiff of any material facts or circumstances which in fairness to herself or to others she should have considered in the making of the gift," and that "the relationship was one of uberrima fides and the court will scrutinize the transaction to ascertain whether the defendant has failed to live up to his trust." We agree with this statement of the confidential relationship. In January, 1924, appellee requested and received a list of appellant's securities and made an analysis of them. He obtained her consent to buy and sell securities for her, although for years she had been managing her estate through the agency of a Pittsburg bank. He discussed loans at the bank and the interest rates she paid. He prepared an analysis for her, particularly in relation to transfer taxes and recommended the sale of a large percentage of her holdings. He also discussed these matters with his lawyers. On January 5, 1925, when this gift was first suggested by the appellant, she had decided definitely to turn over to him the management of her estate, and on the 6th of January she directed her attorney to prepare papers nominating appellee her attorney in fact, to manage her estate in place of the Pittsburg bank. Appellee testified that he was to be named executor in her will when one was made. He said she had suggested a sale of the stock of the Standard Oil Company of New Jersey, and the appellee planned to pay off a bank loan which was owed by appellant.

On January 5 appellee testified that he visited appellant while she was confined to her bed, and at that time she informed him of her desire to make the gift in question, because she wanted to set him up in business. The deed of gift was prepared by the appellant's attorney on information derived solely from the appellee and it recited the purpose in making the gift to be to set him up in business. The appellee called at the attorney's office and gave directions for drawing the deed of gift, and later in the day called for it, but the attorney refused to deliver it to him and insisted upon seeing the appellant personally. This he did that afternoon, and she told him that she was making a gift to correct an injustice which her recently deceased son had done in discriminating in favor of one son and against another in his will. The next day she stated to an officer of her bank that she made the gift to the appellee because he had represented to her that he had been unjustly treated in her son's will and reiterated this statement on January 23 to another officer of the bank. When she wrote her son Josiah C. Thaw informing him of this gift on March 28, 1925, she said she did it because of what she had regarded as "unconscious injustice to one son over the other." On May 15, 1925, she wrote appellee:

"You upbraid me with having consulted unfriendly advisors. On the contrary, the trouble all comes from my not having consulted any one, except listening to your side of the case, until after making the preposterous gift, through ignorance of the provisions in your father's will, and my thinking without consulting those who have set me right, that there had been an injustice shown to one son as against the other. I think, too, there might have been undue influence to bear on my son Edward to prevent him from revising his will during his last illness in California."

The appellee testified that in August, 1924, he told the appellant of the contemplated gift of $210,000 from Jane Thaw, and on December 19, 1924, he advised her that the negotiations were practically come to naught. He repeated that on January 5, 1925, the appellant said that she had obtained the impression from these conversations that he had received a very meager portion from his father while his brother was receiving a great deal of money, and that this might have been brought about by undue influence. The appellant was not in physical condition to testify at the trial, but her deposition was taken in September, 1925, and she then said that the appellee had talked to her about his share in his father's estate and criticized the provisions of his father's will, and that she was sorry for him because he seemed to be "out of sorts with some of the family," and she felt "an overweening compassion" for him. The appellee did not inform the appellant on the evening of Jan-

uary 5 or thereafter that this gift required her to pay approximately $92,000 in income and gift taxes, nor did he make clear to her the proportionate part of her estate she was giving, and he testified he did not suggest to her that she consult impartial advisors before making the gift, nor did they consider the best means of doing so to avoid the payment of such large taxes and other expenses. The appellee dictated a letter on January 6, 1925, to the bank which was signed by the appellant, directing the turning over of a large block of appellant's securities to the brokerage firm with which the appellee was associated, and it was a large part of the proceeds of the sale of this stock that was used in making the gift.

Appellee testified that on the evening of January 5 it was definitely determined that he was to manage her estate, and he decided that night not to accept the power of attorney, but did not so inform the appellant. He was then asked: "Q. You would rather let it down easy? A. Absolutely, after this gift." Although the appellee was in close touch with appellant's son Josiah, living in New York, he did not advise him of the gift or of his mother's illness, or of her contemplated change in the management of her estate. He suggested to the nurse that she abandon her intention to notify the son Josiah of appellant's illness in December, 1925, and when another son telephoned from a long distance inquiring as to his mother, the appellee answered that his mother was "getting along all right" and he need not come home.

It is clear to us that the appellant, in failing health, at old age, slowly recuperating from a severe and recent attack of pneumonia, then unable to read and confined to her bed, was incapable of grasping fully and clearly the effect and consequences to her of making so large and important a gift. She had been a devout churchwoman, of excellent charitable disposition, and, as appellee testified, she had been disappointed in her children and was looking around for some one "to carry the Thaw name forward from its present condition back to the height of its past glory," and he says she selected the appellee for the charge. Indeed, the court below found that the appellee in his talk with the appellant, emphasized the injustice between himself and his half-brother, but found that there was no evidence that he misrepresented, and further found that the appellant's purpose in making the gift was to equalize matters between the appellee and his half-brother.

Appellee's whole course of conduct supports the view that he was ambitious and grasping. We have seen that he was endeavoring to obtain more from his father's estate and from his stepmother. He ingratiated himself into appellant's confidence. Unquestionably he would have had a power of attorney with general powers to represent the estate, had it not been for impartial advice later given to the appellant by a bank officer, whereupon she destroyed the power of attorney, which had been prepared, without having signed it. He unquestionably inculcated in the mind of the appellant a belief that he was industrious and ambitious to go into business and be successful, when he did not want to earn his way; he looked for opportunity, a start or an opening, which he alone should have made. He pictured himself as a disappointed grandson, who had been unjustly dealt with in the matter of inheritances. Whether or not his father unjustly discriminated against him is beside the mark. Men might differ as to this upon the facts disclosed. Indeed, the will of his father showed thoughtful, if not affectionate consideration for him in the disposition of his estate. He was rich in his own right. In any event, he was dealing with his grandmother, whose trust and confidence he had obtained, and he accepted almost one-sixth of her estate as a gift without suggesting that she first obtain independent advice or consider the proportion she was giving and her other plans for testamentary disposition of her property. He did not exercise care and protection to her, or that perfect good faith which this relationship required.

On March 28, 1925, she wrote her son Josiah, advising him of this gift, and "am sure it was largely due to my physically weakened condition, affecting my judgment, as it has on two or three other occasions," and on the same day she wrote appellee inclosing a copy of this letter, and said: "Surely my mental machinery was not working well in January, but the blunder, made out of my passion for equity, can be corrected promptly and quietly, and feel sure you will agree with me that, the sooner it is corrected, the better for all concerned." These phrases of such natural expression undoubtedly correctly state her condition of mind when the gift was made.

[2] For this confiding aged woman to secure relief in a court of equity, it is not necessary to establish her insanity or mental condition rendering her entirely incapable of executing a valid gift. Allore v. Jewell, 94 U. S. 506, 24 L. Ed. 260. "Extreme weak-

ness * * * will raise an almost necessary presumption of imposition, even when it stops short of legal incapacity; and though a contract, in the ordinary course of things, reasonably made with such a person, might be admitted to stand, yet if it should appear to be of such a nature as that such a person could not be capable of measuring its extent or importance, its reasonableness or its value, fully and fairly, it cannot be that the law is so much at variance with common sense as to uphold it." Harding v. Handy et al., 11 Wheat. 103, 152 (6 L. Ed. 429). Here, at a time when she was suffering infirmities of body and was mentally weak, appellant disposed of one-sixth of her estate to her grandson, who occupied a trusted and confidential relationship, either to establish him in business or to correct a real or fancied wrong done him by failure to receive as much as his brother did from his father's estate.

[3, 4] In such situations, the courts have always been careful not to fetter their useful jurisdiction of intervening. This relationship, resulting from having won a place of confidence and sympathy, should not have been abused or an influence exerted to obtain an advantage to appellee at the expense of this confiding old lady. One who does take such an advantage may not retain its gains. Although the gift may not have been impeached, if such confidential relation had not existed, where it does, the duties involved in it require candor in communication and dealing and the fairest and fullest explanation to and with the person so trusting. Otherwise it is against good conscience, and it is peculiarly within the province of a court of conscience to set aside such gifts. Harding v. Handy, supra; Adams v. Cowen, 177 U. S. 471, 20 S. Ct. 668, 44 L. Ed. 851; Riggs v. Gillespie (C. C. A.) 241 F. 311; Bowen v. Kutzner (C. C. A.) 167 F. 281; Corrigan v. Conway, 269 Pa. 373, 112 A. 466; McConville v. Ingham, 268 Pa. 507, 518, 112 A. 85; Plankinton's Estate, 212 Pa. 235, 61 A. 888; Worrall's Appeal, 110 Pa. 349, 1 A. 380, 765; Matthaei v. Pownall, 235 Pa. 460, 84 A. 444; Green v. Roworth, 113 N. Y. 462, 21 N. E. 165; Hawkes v. Lackey, 207 Mass. 424, 93 N. E. 828, 44 L. R. A. (N. S.) 1123; Post v. Hogan, 71 N. J. Eq. 234, 65 A. 1026, 124 Am. St. Rep. 997. The cases establish that certain relationships in and of themselves give rise to a presumption of invalidity, as a gift to an executor, Eddy v. Eddy (C. C. A.) 168 F. 590; a gift by a client to his attorney, Dunn v. Dunn, 42 N. J. Eq. 431, 7 A. 842; a gift by a patient to his physician, Matthaei v. Pownall, supra; a gift to one holding a power of attorney, Darlington's Estate, 147 Pa. 624, 23 A. 1046, 30 Am. St. Rep. 776; where a young member of the family is also in a confidential relation, either of business or advisor, a gift from an older member of the family is presumptively invalid, Corrigan v. Conway, supra; Darlington's Estate, supra.

[5] The appellee does not satisfy us that he has overcome this presumption. The courts have not defined the particular instances of confidential relations in such a manner that other purposes might be excluded, but it is settled by the weight of authority that, where confidence is abused or influence exerted and an advantage gained at the expense of the confiding party, the principles here announced control. The broad principles upon which the court acts are that, wherever there exists such a confidence as enables a person in whom the confidence or trust is reposed to exert influence over the person trusting him, a court will not allow any transaction between the parties to stand, unless there has been the fullest and fairest explanation and communication of every particular resting in the breast of the one who seeks to establish a gift from the donor who trusted him.

But it is said that the appellant ratified her action by letter of March 31, 1925, addressed to her attorney, wherein she said: "I want to say as emphatically as possible that Lawrence C. Thaw did not suggest to me, simply accepted my proffered gift." But her letter refers to her blundering in January in making the gift, when her mental condition as well as her physical condition was at low ebb, and "as I look back at it, it would have been more honorable had he [Lawrence] advised that I consult my lawyer and confidential advisor in the Fidelity, before carrying out my proposal."

The contents of this letter cannot be spelled out to be the language of a ratification of a voidable deed theretofore made. Nor is what was said by the appellant on the occasion of a meeting between the appellant, her son, and appellee on March 31st sufficient to establish a ratification. Her letters of March 28th to appellee as well as to her son, indicate a friendly demand that the matter "be corrected promptly and quietly," for, as she stated, "you will agree with me that, the sooner it is corrected, the better for all concerned." The right to property as acquired by this appellee may not be considered confirmed by the appellant, unless there was full knowledge of all the facts, full knowledge of her equitable rights aris-

ing out of those facts, and an absolute release for the appellee for the overreaching and representations which enabled him to obtain this gain. In order to confirm this gift, it would be necessary to show. that the appellant did so with full knowledge and after sufficient advice and protection and in clear terms. Quigley v. Mutual Life Ins. Co., Fed. Cas. No. 11,511; Wade v. Pulsifer, 54 Vt. 45; Moxon v. Payne, L. R. 8 Ch. App. 881.

The court below erred in denying the relief prayed for. The appellant should have had a decree.

Decree reversed.