# ADAMS *v.* COWEN.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SIXTH
CIRCUIT.

No. 113 of October Term, 1898. Argued January 10, 11, 1900.—Decided April 16, 1900.

Thomas W. Means died in 1890, leaving a large estate, and a will made some ten years before his death, containing, among other provisions, the following: " Item 4. I give, devise and bequeath all the residue and remainder of my estate, personal, real and mixed, wherever situated or located, of which I shall die possessed, to be equally divided among my four children, John Means, William Means, Mary A. Adams, and Margaret A. Means, and my grandson, Thomas M. Culbertson (son and sole heir of my deceased daughter Sarah Jane Culbertson) who shall be living at the time of my decease, and the issue of any child now living, and of said grandson, who may then have deceased, such issue taking the share to which such child or grandson would be entitled if living. But said share given, devised and bequeathed to said grandson or his issue is to be held in trust as hereinafter provided, and to be subject to the provisions hereinafter contained as to said grandson's share. " Item 5. I have made advances to my said children which are charged to them respectively on my books, and I may make further advances to them respectively, or to some of them, and to my said grandson, which may be charged on my books to their respective accounts. I desire the equal provision, herein made for said children, and the provision for said grandson, to be a provision for them respectively, in addition to said advances made and that may hereafter be made, and that in the division, distribution and settlement of my said estate, said advances made and that may hereafter be made, be treated not as advances, but as gifts not in any manner to be accounted for by my said children and grandson, or any of them or the issue of any of them." He was in the habit of advancing money to his children, the amounts advanced to each individually being entered against him in the father's books. At the date of the will the several amounts so advanced were as follows: John, $79,214.36; William, $58,409.54; Mrs. Adams, $51,207.48; Margaret, $39,120.78; Mrs. Culbertson, $29,609.82. Subsequently, in 1898, William becoming involved, the amount advanced to him was largely increased in manner as set forth in the statement of the case and opinion of the court. After the death of the father a claim was made that the money thus paid out for William was to be held to be a part of his share of his father's estate. *Held*:

(1) That in the absence of some absolute and controlling rule to the contrary, the intentions of a testator, as deduced from the language of the will, construed in the light of the circumstances surrounding

him at the date of its execution, always control as to the disposition of the estate;

(2) That the testator believed that after he had done in his lifetime what, in his judgment, his children severally required, there would be an abundance of his estate left for distribution, and intended that all dealings between himself and each of his children should be wiped out, and that what was left after having discharged to each his paternal obligation should be distributed equally.

After the probate of his father's will, William gave to the administrators of the estate with the will annexed, an acknowledgment of the receipt from them of $136,035.75 in his own notes to his father as part of his distributive share of his father's estate. At the time when this was done he was in straitened circumstances, was broken in spirit and was wavering in his purposes. *Held*, that while a man in the full possession of his faculties and under no duress may give away his property, and equity will not recall the gift, yet it looks with careful scrutiny upon all transactions between trustee and beneficiary, and if it appears that the trustee has taken any advantage of the situation of the beneficiary, and has obtained from him, even for only the benefit of other beneficiaries, large property without consideration, it will refuse to uphold the transaction thus accomplished; and that the conclusions of the Circuit Court of Appeals in this case must be sustained, and its decree affirmed.

On November 16, 1891, the respondents, trustees for the wife and children of William Means, filed their bill in the Circuit Court of the United States for the District of Kentucky against the petitioners as administrators (with the will annexed) of Thomas W. Means, deceased, and John Means, a son of said Thomas W. Means. The case passed to hearing in that court upon pleadings and proofs, and resulted in a decree, on July 31, 1895, in favor of the defendants, dismissing the bill. From such dismissal the plaintiffs appealed to the Circuit Court of Appeals for the Sixth Circuit, which court, on February 8, 1897, reversed the decree of dismissal, and entered a decree in favor of the plaintiffs. 47 U. S. App. 439–676. On May 24, 1897, a petition was filed in this court for a certiorari, which was allowed, and on December 6, 1897, the certiorari and return were duly filed. At the October term, 1898, of this court, after argument and on May 22, 1899, the decree of the Circuit Court of Appeals was affirmed by a divided court. Thereafter upon petition a rehearing was ordered, and the case was argued at the present term before a full bench.

The facts are these : Thomas W. Means, a resident of Ashland, Kentucky, died there on June 8, 1890, leaving an estate consisting chiefly of personal property, which was appraised (including the notes of his son, William Means, for $136,035.75) at $752,302.44. He left four children, John Means, William Means, Margaret A. Means and Mary A. Adams, and one grandson, Thomas M. Culbertson, the only child of a deceased daughter. Some ten years prior to his death, and on July 20, 1880, he made a will, in which, after provisions for the payment of his debts, funeral expenses and expenses of administration, were these two items :

"Item 4. I give, devise and bequeath all the residue and remainder of my estate, personal, real and mixed, wherever situated or located, of which I shall die possessed, to be equally divided among my four children, John Means, William Means, Mary A. Adams, and Margaret A. Means, and my grandson, Thomas M. Culbertson (son and sole heir of my deceased daughter Sarah Jane Culbertson) who shall be living at the time of my decease, and the issue of any child now living, and of said grandson, who may then have deceased, such issue taking the share to which such child or grandson would be entitled if living. But said share given, devised and bequeathed to said grandson or his issue is to be held in trust as hereinafter provided, and to be subject to the provisions hereinafter contained as to said grandson's share.

"Item 5. I have made advances to my said children which are charged to them respectively on my books, and I may make further advances to them respectively, or to some of them, and to my said grandson, which may be charged on my books to their respective accounts. I desire the equal provision, herein made for said children, and the provision for said grandson, to be a provision for them respectively, in addition to said advances made and that may hereafter be made, and that in the division, distribution and settlement of my said estate, said advances made and that may hereafter be made, be treated not as advances, but as gifts not in any manner to be accounted for by my said children and grandson, or any of them or the issue of any of them."

Thomas W. Means was a prosperous iron manufacturer, who had, as stated, accumulated in his lifetime a large estate. For many years he had been in the habit of letting his children have money. This he had been doing for at least twenty-five years before the making of the will. This money was not given to them in equal sums at regular or irregular intervals. In other words, he was not making a partial, and equal distribution of his estate in advance of his death, but the money was paid to or for one or another of his children as occasion seemed to call for it. Accounts were entered with each of these children in his books, and the money thus paid to or for them was charged against them in these accounts, so that upon the face of the books they stood as debtors to him for the amounts so charged. The amounts thus charged were sometimes large. The accounts were often reduced by money or property returned to the father. So the father dealt separately with each child, letting him or her have money whenever in his judgment the interest of the child called for it. He was helping them in their business, paying their debts and otherwise using his large properties for their benefit. At the same time the accounts were kept in his books in such a way as to indicate that he retained a claim against each child for the balance shown on such account. He made memoranda on his books, such as this at the head of John's account: "This account and the accounts of William Means and Mary A. Adams are not to be charged with interest when final settlement is made, or at any time. Thomas W. Means." With that as the relation between himself and children, Thomas W. Means made the will containing the two items above quoted. He was then seventy-seven years old. At the date of the will the accounts showed the following debtor balances:

| John | $79,214 36 |
| William.., | 58,409 54 |
| Mrs. Adams | 51,207 48 |
| Margaret | 39,120 78 |
| Mrs. Culbertson | 29,609 82 |

In 1888 a bank in Cincinnati, of which William was president, failed, a failure which brought financial ruin to William. To

relieve him from the embarrassment and dangers which threatened by reason of such failure, a large sum of money was paid out by Thomas W. Means for William's benefit. The question presented in this case is whether the money thus paid out is to be held a part of William's share of his father's estate, or whether it is to be deducted from the estate and the division made of the balance between the five legatees.

*Mr. Lawrence Maxwell, Jr.*, for petitioners. *Mr. Julius L. Anderson* and *Mr. John F. Hager* were on his brief.

*Mr. John J. Glidden* and *Mr. Judson Harmon* for Cowen. *Mr. H. P. Whitaker* and *Mr. John Little* were on their brief.

MR. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

The primary question is upon the construction of the fifth item of the will of Thomas W. Means. If there had been no such item of course all sums due from the children and grandchild to the father and grandfather would be part of the property of his estate and to be counted in determining the sum to be divided among the five in accordance with item four. But item five evidently contemplated that some amounts were to be deducted from the gross sum of the decedent's property before a division was to be made. What were those deductions? What did the testator intend should be deducted? For, in the absence of some absolute and controlling rule of law to the contrary, the intentions of a testator, as deduced from the language of the will, construed in the light of the circumstances surrounding him at the date of its execution, always control as to the disposition of the estate. Without entering into any discussion we make these quotations from prior decisions of this court. In *Smith* v. *Bell*, 6 Pet. 68, it was said by Chief Justice Marshall:

" The first and great rule in the exposition of wills, to which all other rules must bend, is that the intention of the testator expressed in his will shall prevail, provided it be consistent with the rules of law. 1 Doug. 322; 1 W. Bl. 672. This principle

is generally asserted in the construction of every testamentary disposition. It is emphatically the will of the person who makes it, and is defined to be 'the legal declaration of a man's intentions which he wills to be performed after his death.' 2 Bl. Com. 499. These intentions are to be collected from his words and ought to be carried into effect if they be consistent with law. In the construction of ambiguous expressions, the situation of the parties may very properly be taken into view. The ties which connect the testator with his legatees, the affection subsisting between them, the motives which may reasonably be supposed to operate with him, and to influence him in the disposition of his property, are all entitled to consideration in expounding doubtful words and ascertaining the meaning in which the testator used them. . . . No rule is better settled than that the whole will is to be taken together, and is to be so construed as to give effect, if it be possible, to the whole. . . . Notwithstanding the reasonableness and good sense of this general rule, that the intention shall prevail, it has been sometimes disregarded. If the testator attempts to effect that which the law forbids, his will must yield to the rules of law. But courts have sometimes gone farther. The construction put upon the words in one will has been supposed to furnish a rule for construing the same words in other wills; and thereby to furnish some settled and fixed rules of construction which ought to be respected. We cannot say that this principle ought to be totally disregarded; it should never be carried so far as to defeat the plain intent; if that intent may be carried into execution without violating the rules of law. It has been said truly, (3 Wils. 141,) 'that cases on wills may guide us to general rules of construction; but unless a case cited be in every respect directly in point, and agree in every circumstance, it will have little or no weight with the court, who always look upon the intention of the testator as the polar star to direct them in the construction of wills.'"

And in *Blake* v. *Hawkins*, 98 U. S. 315, 324, Mr. Justice Strong used these words:

"It is a common remark, that, when interpreting a will, the attending circumstances of the testator, such as the condition

of his family, and the amount and character of his property, may and ought to be taken into consideration. The interpreter may place himself in the position occupied by the testator when he made the will, and from that standpoint discover what was intended."

See also *Clark* v. *Boorman's Executors*, 18 Wall. 493; *Colton* v. *Colton*, 127 U. S. 300; *Lee* v. *Simpson*, 134 U. S. 572.

In the light of these decisions we turn to inquire what was the intention of the testator? Suppose that on the next day after making this will he had died, upon what basis would the distribution of his estate have been made? Obviously by first cancelling all the gifts and advances made to his children, and then distributing the balance equally between the five. For he declares that the equal provision made by item four shall be in addition to his advances, "and that in the division, distribution and settlement of my said estate said advances . . . be treated not as advances, but as gifts not in any manner to be accounted for by my said children and grandson, or any of them, or the issue of any of them." Language could not be more clear. Nothing could express the intent of the testator more forcibly than these words. Whatever he had done in the way of letting his children and grandson have money was to be taken as a matter of gift, for which none of the recipients was to account, and only his estate, less such gifts and advances, was to be equally distributed between the legatees named. And this intent, which is so clearly disclosed, in respect to what he had already done, is equally clear in respect to what he might do thereafter. He says that he "may make further advances to them respectively, or to some of them," and declares that in the division, distribution and settlement of his estate "said advances . . . that may hereafter be made, be treated, not as advances, but as gifts." In other words, as he had used some of his property in the past again and again to help his children, he saw that it was likely in the future he might do the same thing, and declared not only that every dollar he had let them have in the past, but also every dollar that he might let them have in the future should be taken, "not as advances, but as gifts." Not only that, but that such gifts should not be accounted for in any manner

by any of the recipients, and that only the balance of his estate, after all these personal gifts were cancelled, should be distributed equally among the legatees. As in the past he had freely used his estate for the benefit of his children, so he announced his intention to deal as freely with it in the future, and to use any part of it in any way that he might deem best for the interests of any one of his children, and declared that such help given, or that might be given in the future, should not be made the basis of any accounting between his legatees. He knew he had a large estate, and that, whatever he might do with a fraction of it, there would be an abundance left for each of them — enough to place them beyond the reach of want. He had the large and generous paternal feeling; that feeling which prompts the parent to care as best he can during his lifetime for each of his children according to their respective wants, and he did not mean that anything he did for one child should be challenged by another. He doubtless recalled, as every parent does, that during infancy and childhood one child had called for more attention and care, more hours of toil and watch, than another. He realized that as they had grown to manhood and womanhood, and entered into their various places in life, there had been different calls for pecuniary assistance, and that doubtless there would be differences in the future. He knew that he had responded to every need of each child in its early days, was trying in the later days of manhood and womanhood to make like responses, and felt that while life should be prolonged to him he would be under the same pressure of affection to each. He believed that after he had done in his lifetime what in his judgment they severally required there would be an abundance of his estate left for distribution, and intended that all dealings between himself and each of his children should be wiped out — there should be a *tabula rasa* — and that what was left (and it would be a large estate) after having discharged to each one his paternal obligation, the untouched estate should be distributed equally. We do not see how that purpose and thought of his could be expressed more clearly and forcibly than it was done in the fifth item of the will, and it would be a sad commentary on the wisdom of the law if that purpose was not recognized and enforced.

It is said that there is an expressed limitation on this generous purpose in that he describes the advances already made as "charged to them respectively on my books," and that as to further advances they "may be charged on my books to their respective accounts," and that in order that any subsequent advances should come within the scope of this provision they should be formally charged on his books "to their respective accounts." We cannot believe that the generous purposes of the father were intended to be limited by the action of a bookkeeper. In the full possession of his faculties and watchful over his books he knew what entries had been made, and that they told the full story of his advances to his children, and so, not unnaturally, he referred to those books as evidence of those advances, but as to future advances he says only that they "may be charged on my books," and surely he did not make the possibilities of such entries the measure of his generosity. He was 77 years of age when this will was made. He could not foresee the length of days which might be allotted to him nor the possible failure of any of his faculties—and indeed before his death there was a failure of eyesight, and possibly, towards the last, of his mental powers. Of course, when he made this will he knew the possibility of these things, and it is inconsistent with the whole spirit of the will to suppose that he meant that his generosity should be determined and measured by the fidelity or forgetfulness of a mere clerk. No man acting in a spirit of generous affection ever contemplates that a stranger shall measure the scope and reach of such affection. It is a matter personal to himself, the beginning and ending of which, the scope and limits of which, he and he only is to determine.

With this understanding of the scope and purpose of this clause in the will, we pass to a consideration of what took place in respect to the advances for the benefit of his son William. At that time the father was feeling the weaknesses of old age, his eyesight was failing, and he had called his son John to act as his agent in the care of his estate. News of the disaster to the bank and the effect of its failure on the welfare of his son William came to the father, and John went to Cincinnati to investigate, came back and reported the situation as he had

found it; told his father of the personal loans made to William by the bank, and that they were secured by collateral. We quote his testimony as to the conversation with his father:

"Q. 832. What communication did you have with your father upon your return to Ashland ?

"A. I told him of William's debt to the bank—individual debt—and what it would probably amount to, and that friends here advised it was for William's interest that that debt, individual debt, should be paid. I told him that the securities which William had turned over to the bank as security on the debt would some of them probably be sacrificed at a sale here —that I thought we had better pay the debt.

"Q. 833. What did he say ?

"A. He said that he was satisfied to do whatever I thought was best.

"Q. 834. What else did he say about the matter other than to say to you that he was satisfied to do whatever you thought was best ?

"A. Well, I think I have answered it. I cannot repeat the conversation between us any more than give the general result of it."

On the faith of this conversation John returned to Cincinnati, and having raised the needed money, paid off William's obligations to the bank and took up the collateral, whose face value was largely in excess of the indebtedness. That the collateral when properly utilized, as it apparently was, did not pay the amount of William's indebtedness to the bank, is immaterial, nor is it material that William gave a note for the amount of this advance, as well as other notes afterwards for like advances, and that such notes were entered on the books of the father in the account of " bills receivable." It appears that this payment was not made at the request of William, but made upon · consultation between the father and his son and agent, John, and made probably with the expectation that the collateral, if properly used, would pay the amount of the indebtedness.

And here it becomes important to consider the relations of John Means to his father. As the father grew old and his faculties began to fail he naturally called his oldest son John into his service, and John acted during the last years of his father's life as his agent, and it was really at John's suggestion

that the money was advanced for the benefit of William. But in calling John to his service as agent and caretaker of his property there is nothing to indicate that the father meant that the son should do anything to prevent the full carrying out of the purpose expressed in his will. He had no express authority, and indeed no implied authority to alter that instrument in which had long been recorded the settled determination of the father. So that whatever he may have done in caring for the property as the agent of his father during his lifetime is not to be taken, unless there are other circumstances to indicate the fact, as showing an intent on the part of the father to change in any way the scope and effect of the will.

And indeed it is but simple justice to John Means to say that from the evidence we are satisfied that there was no thought or intent on his part to change or limit his father's will. He did not intend by any strategy or device to thwart his father's purpose of kindness to any of his children, nor did he pursue the course he did in respect to this advance with the idea that he could satisfy his father's desire to help William and at the same time place the act of help outside the reach of item five of the will, and thus advance the pecuniary interest of himself and the other legatees not thus helped by his father. Very likely he was uncertain as to the construction which would be placed upon item five; possibly thought that even if it meant exactly that which we are clear it does mean, there might be an impropriety at his father's age and feebleness in his advancing so much money for the benefit of a single child, and in order that the transaction, in case of his death before that of his father, might be clearly disclosed, took notes from William and entered them on his father's books under the head of " bills receivable." It appears from some of the testimony that there was also a thought of protecting William's share in the estate which by the death of the father might soon come to him, from attacks of creditors, and it may also be that partly on that account William executed the notes which were received for these moneys. At any rate, the correspondence between the brothers at the time of these transactions indicates that they were friendly, and that John was willingly doing that which he thought the

father desired in using a portion of the father's estate in helping William out of his troubles. But whatever John or William may have purposed or thought, the evidence does not indicate that the father intended that this help extended to William should stand in any different attitude to that which he had theretofore extended to others of his children, or meant that this advance should not come within the scope of the provisions in item five; and that is the fundamental question in the case. It is the father's estate which is being distributed, and it is the duty of the courts to see that it is distributed according to his expressed intention.

The testimony in this case is voluminous, and there are many facts and circumstances disclosed in it throwing light on the questions which we have considered. We have deemed it unnecessary to refer to them in view of the very full and satisfactory opinion filed by the Circuit Court of Appeals, in which these facts and circumstances are recited and considered at length, and which in the main meets our approval.

One further question remains for consideration : The father died June 8, 1890. The will was duly probated, and administrators with the will annexed were appointed and qualified. On October 16, 1890, William Means executed and delivered to these administrators the following receipt :

"ASHLAND, KY., *October* 16, 1890.

"Received of Thomas M. Adams and E. C. Means, administrators with the will annexed of the estate of Thomas W. Means, deceased, the sum of one hundred and thirty-six thousand and thirty-five and 75-100 dollars, being a part of my distributable share as legatee under said will applied by them as ordered by me upon the following notes and claims owed by me to the estate of said decedent, and payable to his order, viz : "

[Here follows description of ten notes, with balance due on each, aggregating $136,035.75.]

" This receipt is given in pursuance of settlement made October 6, 1890.

"WILLIAM MEANS,

"Attest : JOHN F. HAGER.
    "A. E. LAMPTON."

The validity of this receipt or release was challenged by the respondents, (plaintiffs in the Circuit Court,) who claimed title to that portion of the estate of Thomas W. Means passing under the will to William Means by virtue of the following proceedings : At the May term, 1891, of the Common Pleas Court of the county of Greene, State of Ohio, a decree was entered in a cause then pending in said court between William Means on the one side and on the other Martha E. C. Means, his wife, and their children, Gertrude E. Means and Pearl E. Means and Patti Means, a minor, by her next friend, her mother, which, after finding that in the lifetime of Thomas W. Means, for a good and valuable consideration, William Means made an agreement with his wife and children whereby he settled upon them, through trustees, for their maintenance and support, his interest in expectancy in the estate of his father, Thomas W. Means, transferred all such interest to the plaintiffs as trustees.   This decree having been entered after personal service upon William Means, of course binds him both by its findings and order.   How far the findings in such decree as to the agreement and the time at which it was made may affect the action of the administrators is a matter discussed in the briefs, but which we deem it unnecessary to consider.

Neither do we stop to consider the charge of fraudulent conduct on the part of the administrators, for independently of those considerations we are of opinion that equity will not enforce this receipt or release.   It was a surrender by William Means, without any consideration, of practically his whole interest in his father's estate, amounting to between $100,000 and $200,000.   The administrators were acting in a fiduciary capacity.   Their obligations to each of the beneficiaries were equal. Their duty was to dispose of the property placed in their hands according to the expressed will of the testator, and they were not at liberty to act in the interests of one legatee as against those of another.   If they were doubtful as to the meaning of any clause in the will they should have applied to the court for its construction and direction.   If they chose to act upon their own interpretation of its meaning they should have so acted, and not sought to conclude any of the legatees by a contract

binding him to accept their interpretation. As shown by papers introduced in evidence, signed by William Means, they proceeded with more than promptness and with great activity and energy to secure this and other releases. Obviously William Means was in such a condition as to require that they who were in fact trustees of his interests should seek to protect instead of destroying them. We think the evidence justifies that which was said by the Court of Appeals in its opinion :

"William had lost all his property, and was in very straitened circumstances. Since his downfall he has been broken in spirit and wavering in his purposes. He seems at times to have been impressed that the administrators had a moral, if not a legal, claim upon him, that he should yield up his legacy to the estate, and this claim was pressed and insisted upon by the administrators. That they had no such legal claim upon him, we have already determined. His brother and sisters all being in affluent circumstances, and his own family in needy circumstances, that he should have voluntarily given up the whole of this large sum, with no mistake in regard to what his legal rights were, it is difficult to believe. It amounted simply to a gift to the administrators for the benefit of the other legatees, whose only claim rested on the bounty of the testator. Courts of equity view such transactions with distrust, and if the circumstances indicate that the trustee has dealt with the beneficiary unjustly, will not hesitate to set them aside. The absence of any adequate consideration in itself raises a presumption of unfairness, which the trustee is bound to repel."

While a man in the full possession of his faculties and under no duress may give away his property, and equity will not recall the gift, yet it looks with careful scrutiny upon all transactions between trustee and beneficiary, and if it appears that the trustee has taken any advantage of the situation of the beneficiary, and has obtained from him, even for only the benefit of other beneficiaries, large property without consideration, it will refuse to uphold the transaction thus accomplished. *Taylor* v. *Taylor*, 8 How. 183 ; *Comstock* v. *Herron*, 6 U. S. App. 626–637, and cases cited ; 1 Story's Eq. Jur. secs. 307, 308; 2 Pomeroy's Eq. Jur. secs. 951, 958, 1088. So, without considering

the debatable questions presented in respect to this receipt or release, we are of opinion that the Circuit Court of Appeals was right in refusing to uphold it.

There is nothing else in the case that seems to us to call for consideration. We find no error in the conclusions of the Circuit Court of Appeals, and its decree is

*Affirmed.*

Dissenting: MR. JUSTICE HARLAN, MR. JUSTICE GRAY, MR. JUSTICE BROWN and MR. JUSTICE WHITE.