### GRIGSBY v. MILLER et al.

#### (District Court, D. Oregon.   January 29, 1917.)

#### No. 6741.

1. TRUSTS ⬬➔91—"CONSTRUCTIVE TRUSTS"—NATURE—"TRUSTS EX MALEFICIO."

A constructive trust in real estate arises where the purchase is made and title acquired contrary to trust relations existing between trustee and cesuti que trust, or ex maleficio through deceit and fraud, whereby the party whose title has been taken away from him has been misled and overreached, to his injury and detriment.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 139.

For other definitions, see Words and Phrases, First and Second Series, Constructive Trusts; Trusts ex Maleficio.]

2. TRUSTS ⬬➔103(2)—CONSTRUCTIVE TRUST—CONVEYANCE BY DAUGHTER TO MOTHER.

A daughter, 32 years old, married and living with her husband, who joined with her, conveyed certain land to her mother for a nominal consideration. The land was in a lake and could not be used until drained at large expense. The mother had already expended some $8,000 or more on the land, a part of which belonged to the daughter, but leaving her indebted to her mother to the amount of about $6,000, and further large expenditures were necessary. At that time the daughter's husband was largely indebted. The land had been deeded to the daughter by her father and mother, before her father's death and before her marriage. She was the only child and sole heir of her mother. There was no evidence to justify a finding that the conveyance was induced by fraud or undue influence. Held, on the evidence, the daughter having died, that no constructive trust arose in favor of the daughter, but that it was the intention of the parties that the conveyance should vest the mother with title in fee simple.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 154.]

In Equity. Suit by Fenton E. Grigsby, administrator of the estate of Wana Miller Alexander Stuart, deceased, against Sarah E. Miller and J. O. Hayes. Decree for defendants.

See, also, 231 Fed. 521.

⬬➔For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The complainant, as administrator of the estate of Wana Stuart, brings this suit against Sarah E. Miller and J. O. Hayes, to have the respondents declared trustees of certain lands situated in Marion county, Or., known as the "Lake Labish lands," and certain personalty in the way of moneys arising from the sale by respondent Miller of certain other lands alleged to be the property of Wana Stuart in her lifetime, holding under a constructive trust arising from alleged confidential and fiduciary relationship between Miller and Stuart as parent and child, and between Miller and Stuart and Hayes as friend and adviser of the family. Grigsby was appointed administrator of the estate of Wana Stuart by the county court of Marion county, Or., on January 28, 1915, and has qualified as such.

The respondent Sarah E. Miller is the widow of Wm. P. Miller, who died intestate September 25, 1895, and Wana Stuart was their daughter. Wana died intestate October 14, 1914; her husband, John Edward Stuart, surviving her as her only heir at law. On May 17, 1895, Miller and his wife, one of the respondents herein, conveyed to Wana 522.86 acres of the Lake Labish lands. On September 5, 1900, Wana acquired by deed from A. A. Lee and F. W. Waters and their wives another tract, containing 97.08 acres, and the title to still another tract, containing 55.22 acres, was confirmed in her by virtue of a judgment of the Supreme Court of the state of Oregon, all in the Lake Labish district. On June 1, 1895, Miller and wife conveyed to Wana an undivided one-half interest in certain lands lying and being in Klamath county, Or., and it is alleged that, at the death of Miller, Wana was entitled to a one-half interest in personalty consisting of several hundred head of stock, cattle, and horses. Wana was formerly married to one J. E. Alexander, from whom she was divorced. Subsequently, and prior to August 1, 1910, she married John Edward Stuart.

Now it is alleged, briefly stated, that Sarah E. Miller was on peculiarly intimate relations with her daughter Wana, and, by reason of her superior mind and dominating personality, she was able to direct and control the disposition and actions of Wana with regard to her property holdings; that Mrs. Miller and J. O. Hayes, her co-respondent, conspired between them to induce Wana and her husband to deed the Lake Labish lands to Mrs. Miller for a nominal consideration, and that, in pursuance of said conspiracy, the respondent Miller did, through unwarranted persuasion and undue influence, induce Wana and her said husband to convey to Mrs. Miller, for the nominal consideration of $10, all of said Lake Labish lands except a small tract omitted by mistake, by deed bearing date August 1, 1910; that subsequently, to wit, on January 15, 1912, Mrs. Miller conveyed to Hayes; that about that time the omission from the deed to Mrs. Miller was discovered, and to correct such omission, and induced through the same unwarrantable influence, Wana and her husband conveyed to Hayes, by another deed of date February 7, 1912, the tract omitted, and that the legal title to all of said Lake Labish lands now stands in the name of Hayes. It is further alleged, by supplemental bill, that Mrs. Miller, through like undue influence, induced Wana to part with her property in Klamath county, the proceeds of which, amounting to a large sum of money, were taken over by Mrs. Miller and converted to her own use, for which an accounting is prayed.

The respondents, for answer, deny any conspiracy between themselves to procure the conveyances from Wana of the Lake Labish lands, or that Mrs. Miller exerted over Wana and her husband any undue or unfair influence by which they, or either of them, were induced to make or execute the deeds in question, and protest that the execution of such deeds was the free and voluntary act of Wana and her husband, uninfluenced by any one save themselves, and was in consideration of large sums of money that Mrs. Miller had paid to Wana and her husband Alexander, and Wana and her husband Stuart, in her lifetime, and for taxes, and large expenses paid for numerous pieces of litigation which were instituted and pending from time to time in relation to the lands. Respondents further allege that Mrs. Miller conveyed the premises to Hayes in consideration and in pursuance of a contract and agreement, made and entered into between them, whereby Hayes agreed to reclaim the lands through proper drainage, and to clear the same and render them fit for cultivation, at his own trouble, cost, and expense, and, when fully reclaim-

ed, to dispose of the same, and divide the net proceeds with Mrs. Miller, and that said lands are held by Hayes in fee simple, subject to the agreement on his part to make division with Mrs. Miller of the profits after sale.

The respondent Miller, further answering the supplemental bill of complaint, denies that Wana Stuart ever had or owned any interest whatever in the range stock, consisting of cattle and horses, which W. P. Miller left at the time of his death, but admits that Wana owned an undivided one-half interest in the lands, which it is alleged were all disposed of prior to the close of the year 1906, and for which there was realized in one sum $12,500 and in another $22,927.92, and that Mrs. Miller paid over and accounted to Wana, during her lifetime, for all her interest in the proceeds of such sales. Further answering to the bill of complaint, it is alleged in effect that, on the 17th day of March, 1913, Mrs. Miller and Wana had an agreement and settlement touching their financial affairs, and that, by such agreement and settlement, Mrs. Miller undertook to pay Wana $10,000 in money or property, as best suited Mrs. Miller, in consideration for which Wana released Mrs. Miller from all claims or demands whatsoever against her. Having thus answered, the respondents pray a dismissal of the bill.

William C. Bristol, of Portland, Or., for complainant.

Almon E. Roth, of San Francisco, Cal., for respondent Hayes.

Harry L. Raffety, of Portland, Or., for respondent Miller.

WOLVERTON, District Judge (after stating the facts as above). A question has been presented respecting the regularity of Grigsby's appointment as administrator of the estate of Wana Stuart, and the power of the county court of Marion county, Or., so to appoint him; but I waive this aside, and proceed to a determination of the cause upon its merits.

The deed by Wana Stuart and her husband, John E. Stuart, to Mrs. Miller, of August 1, 1910, is the storm center of this entire controversy, and it will be well to get a reckoning of the currents that tended to converge about this point of time and event, that we may appreciate the situation of the parties interested, and thus be the better enabled to determine more certainly the motives and considerations that induced the making of the deed, and its real and ultimate purpose.

The purpose of W. P. Miller and his wife, the respondent Sarah E. Miller, in deeding to Mrs. Stuart the Lake Labish land and an undivided one-half interest in the Klamath county lands, was to expedite the division and settlement of Miller's estate. Miller knew at the time that he could not long survive, and he, with Mrs. Miller's concurrence, of course, conveyed to the daughter these lands. Miller, at or about the same time, conveyed to Mrs. Miller an undivided one-half interest in the Klamath county lands, and gave her a bill of sale of all his personal property, consisting of range stock and such other personalty as he had. The estate was practically settled at the date of Miller's death. He owed considerable money prior thereto, and, in order to repay the same, sold cattle and used money and property that belonged to Mrs. Miller individually—to what extent the record does not make clear. She had a note of her own, amounting to $5,000. Then she had a house in The Dalles, Or., for which she obtained between $4,000 and $5,000. She claims, also, to have put something like $7,000 of her own money into the Klamath county lands when they were purchased by Miller. So that her own individual means were more or less inter-

mingled with Miller's in securing these lands in the first instance. When these settlements were being made by the use of Mrs. Miller's means, Miller told her that she could reimburse herself by taking the money out of the estate.

Thus stood the property relations in 1895, at the time of Miller's death. Mrs. Miller testifies that she had at that time separate property of her own amounting to about $17,000, and she subsequently sold cattle which came.to her by bill of sale from her husband amounting to $4,000. Her previous testimony would seem to indicate, however, that she had expended a portion of this money in meeting the claims against Miller's estate, which were all paid as we have seen prior to his death.

Wana was married to John E. Alexander in 1897. Mrs. Miller must have had some ready money of her own at that time, because she gave to Wana in May, 1897, a few days after she was married, $1,300, and paid to her besides, as wedding and traveling expenses, $4,000. Both these sums of money must have come out of Mrs. Miller's individual property, for none of Wana's land had been sold at that time. Nor was any disposed of from which any money was derived until the sale of what was known as the "Upper Ranch," in Klamath county, to Fred and Gustave Melhase, August 14, 1903, for which was paid the sum of $12,500. Whether Mrs. Miller obtained rents and profits from the Klamath lands in the meantime does not appear. But it would seem that they were a source of expense rather than of profit, for it was necessary to sell stock from time to time to meet taxes and expenses. Three thousand dollars worth of stock was sold at one time, and $2,300 at another, for these purposes. It was not, therefore, until August 14, 1903, so far as the record shows, that any money which was the property of Wana came into the hands of Mrs. Miller. I say this, with this qualification:

On June 20, 1901, Mrs. Miller and Mr. and Mrs. Alexander made a conveyance to E. P. McCornack for a consideration of $559.65. On January 28, 1901, the same parties, for a stated consideration of $162.90, made another deed to one Frederick F. Cassidy. On November 1, 1900, the same parties, for a stated consideration of $400, made another deed to McCornack, and on October 27, 1904, the same parties gave a quitclaim deed to a piece of property to Charles E. Worden for a stated consideration of $2,300. Alexander testified concerning these deeds, and failed to state that any money was paid to Mrs. Miller on account of them. He was the son-in-law of Mrs. Miller, and acting attorney for her and his wife at the time, and was instrumental in negotiating the execution of the deeds, and in a position to know whether any money passed to Mrs. Miller as a consideration therefor, but remains silent about it. He does attempt to explain, however, that the deeds were given in exchange for other lands for the purpose of straightening out certain boundaries, and leaves the impression that no real money consideration passed. If any money was paid, it would naturally have been paid to Alexander, and then it would have been incumbent upon him to pay it over to Mrs. Miller or his wife. Mrs. Miller says she received no money on account of these deeds, indeed,

she has no recollection as to their execution. She does say that Alexander told her at one time that he had a check for $600 arising from this source, but that Alexander never accounted to her for, or paid her any part of, the money. I do not think the deeds themselves, in the light of all the other testimony attending the transactions, afford sufficient evidence by which to charge Mrs. Miller with the sum of the stated considerations named therein.

Wana was divorced from Alexander some time later than the date of the Melhase deed, which, as we have seen, was August 14, 1903. On June 19, 1905, she married John E. Stuart. A little later than this, namely, September 20, 1905, Mrs. Miller and Mr. and Mrs. Stuart conveyed to one ·Weed the remainder of the Klamath lands, and the net amount received therefor, according to Mrs. Miller, was $23,000. In this she is substantially corroborated by other testimony in the record. This money came to the hands of Mrs. Miller by check, and was deposited in a savings bank, and, according to Stuart's testimony, was later divided among other banks for deposit.

Mrs. Miller testifies that she paid to Alexander, at the request of Wana, several amounts of money, which are itemized by her, aggregating $6,370; that she paid to Wana, prior to her marriage to Alexander, the sum of $6,650, and to Wana, after her marriage to Alexander, the further sum of $2,300. These aggregates are likewise itemized by Mrs. Miller. Beyond this, Mrs. Miller shows that she paid expenses in connection with the Lake Labish lands aggregating $10,002.66. I am taking no note of many small items which it is claimed, ·under one list, that Stuart received aggregating $2,660, and, under another, that Wana received, prior to March 17, 1913, aggregating $1,976.60. Not all of this sum of $10,002.66 was paid prior to the date of the deed by Stuart and wife to Mrs. Miller, namely, August 1, 1910. In order to get at the expense from this source paid prior to that date, the above amount should be reduced by $1,825, consisting of $200 overcharge in item of mortgage paid on Lake Labish lands, item paid Holmes $1,500, and paid Bush in 1911, taxes, $125, leaving the actual expense paid to that date $8,177.66. Thus was paid to and expended on Wana's account by Mrs. Miller up to that date, August 1, 1910, the total sum of $23,497.66, leaving Wana· in debt to her in the sum of $5,747.66. This gives credit to Wana for one-half of the Melhase sale of $12,500, and one-half of the Weed sale of $23,000, and charges her with one-half of the $600 that Alexander obtained for which he did not account to Mrs. Miller.

In this accounting, Mrs. Miller does not pretend to be able to give an accurate detailed statement of the moneys paid to Wana or by her request, or the expense borne on account of the Lake Labish lands, which were a constant source of outlay without a particle of income. Mrs. Miller has always been economically frugal in her habits, and has lost no substantial amounts in business adventures. She had been put to a great deal of trouble respecting the Lake Labish lands, and had expended considerable sums of money in payment of taxes, in bearing the expenses of much litigation, and in trying to drain the land, so as to· get it in condition to realize from it by sale, all without any appreciable

success. Alexander, who was a lawyer, tried to do what he could to relieve the situation, and Stuart had taken part in the effort to bring profit out of the wild first condition, all without avail. It may be said here that the Lake Labish lands were what the name implies, lands under the water, and the lake required to be drained before the lands could or would become of agricultural value. But when properly drained they would be rendered of great value, because of the peculiar quality of the soil, which is commonly known as beaver dam land. The problem at this time confronting Mrs. Stuart and Mrs. Miller was what should be done to bring these lands into the market, so that something of profit could be realized from them, rather than the large expense, which could not theretofore be avoided.

Another feature of the situation should not be overlooked. Stuart was engaged in the shoe business, and, although at this time his business was incorporated, he was indebted on his personal account, as he says, in "quite a large sum of money," all of which was known to his wife and Mrs. Miller.

Now, in view of these premises, let us inquire why the deed of August 1, 1910, was given, what was its purpose, and what the nature of the title granted. The instrument is an ordinary bargain and sale deed, without covenants of warranty respecting title. It was recorded in the Marion county records on August 8th following its execution. There was no written agreement accompanying it, defining its purpose, or otherwise limiting or circumscribing its legal effect. The deed was prepared by F. H. Bloomingdale, the notary who took the acknowledgment. Mrs. Miller says she requested Stuart to "come up and sign the deed," which he did. Stuart says he understood that it was prepared in J. O. Hayes' office, but it was merely an understanding that he could not verify. Mrs. Miller is positive, however, that it was prepared by Bloomingdale, and not Hayes. Mrs. Miller relates that, having carried the burden of paying the expenses relative to the Lake Labish land, she decided that she could not do that any longer, and, on taking the matter up with Wana, the latter agreed to deed the land to her. It was in pursuance of this understanding that the deed was made. On being questioned further, she says there was no understanding that she was to hold the land in trust for Wana; that Wana understood, when she made the transfer, that it settled everything up to that date; and that a contract was made after that whereby Mrs. Miller agreed to give Wana $10,000, and that Wana then transferred everything to her absolutely that she had. Mrs. Miller at once, on receipt of the deed, came up to Salem and had it recorded, and took up the settlement of affairs, so as to get the title cleared up. She gave an option to Hartman & Thompson for purchase on their part of the land, thus indicating that, so far as she was concerned, she believed, at least, that she had good title to the land and was entitled to deal with it as her own. Mrs. Miller says further about this transaction:

"I not only wanted the title in my own name, but she [Wana] had had so much money, and she paid it off by giving me the deed of August 1, 1910. Now, that is exactly what I took the deed for. The deed was to satisfy all the indebtedness that existed between her and I up to that time."

240 F.—13

According to Mrs. Miller, Stuart was not satisfied, though he said, when asked to sign the deed, "I don't want any of your property." Stuart says of this transaction that Mrs. Miller proposed to his wife and himself that the land be put in her name, "so that she could continue to see if she could not in some way bring about a settlement up there with the Wattiers and get the thing straightened out." Stuart further relates that the first talk about Mrs. Miller's taking charge of the land was early in 1910; that it came up in connection with a letter that Mr. W. H. Holmes had written to Stuart about some litigation, which bears date March 4, 1910; and that "it was finally determined, on Mrs. Miller's representations and on Mr. Hayes' advice, to transfer this land to Mrs. Miller," which was done. Being asked what representations were made that led to the final culmination of the execution of the deed, Stuart answered:

"One of the principal representations that were made about the matter in connection with that property was in regard to my indebtedness to Mr. Richards. Mrs. Miller worried a great deal about the amount of money that I owed Mr. Richards, and she said that Mr. Richards could come onto my wife and take all of her property; that I owed him this immense sum of money, and was in his power; and she brought that up whenever the matter was referred to, and she talked about it to Wana a great deal. And I think Mr. Hayes himself mentioned to me in one of our conversations that Mr. Richards could come onto my wife for these amounts of money, or this large amount of money, that I owed him; that her interest would not be safe. And I know that my wife was very strongly impressed with that belief, that her property could be in fact confiscated by Mr. Richards, or, in fact, any other creditors that I might have. * * * She believed that her property could be reached by my creditors, whatever creditors I might have. I believe she believed that always."

In further indication as to why Stuart himself signed the deed, he says:

"I simply signed the deed because my wife asked me to. I had no particular interest in not signing it. It seemed to be for my wife's interest. * * * It was necessary for me to sign it, and she asked me to sign it."

As to why Wana gave the deed, witness further says:

"She gave the deed to her mother, so that her mother could go up there and handle the property directly, and try to untangle the troubles it was in for her. * * * She said she was simply giving the property in charge of her mother, till it could be straightened out and gotten in shape for development. * * * But it was a perfectly well understood circumstance that the transfer was simply for the better handling of the property."

A little later the witness says:

"My wife never regarded any of these transactions as in any way affecting her ownership of that property."

He still later asserts that the transfer was absolutely not that Mrs. Miller should get the title forever.

Thus stands the case from the respective viewpoints of Mrs. Miller and Mr. Stuart; they disagreeing, of course, one seeming to believe that the deed of August 1, 1910, was absolute, and designed to settle all matters pecuniary between Mrs. Miller and her daughter, and the other holding to the idea that the deed was given only to enable Mrs.

Miller to settle the matters pertaining to the land, and that no title absolute was intended to pass. Much testimony has been offered with a purpose of showing that Mrs. Miller exerted undue influence over her daughter and thereby induced her to make the deed, and virtually controlled her action thereafter with relation to the handling of the title to this land.

A careful reading of the testimony of Stuart does not disclose that he believed that Wana was dominated by the will of her mother as it affected this transaction. He does say:

"Mrs. Miller always seemed to me to treat Mrs. Stuart as though she were a child in regard to property matters, and she simply assumed the direction and management of their property matters as though Wana did not cut any figure at all."

And at other times he gives the idea that Mrs. Miller kept pressing upon her daughter the thought that Stuart's creditors would come upon her and take her property. But Stuart failed utterly to intimate that Mrs. Miller, with willful and perverse intent, coerced her daughter to make this deed, contrary to the latter's will and wish in the premises. Nor was there any misrepresentation indulged in on the part of Mrs. Miller by which her daughter and Stuart were induced to execute it. Stuart tells specifically for what purpose the deed was given, that Wana understood fully why it was to be executed, and accordingly executed it after requesting that he join with her in the deed.

Mrs. N. S. Carman describes Mrs. Stuart as over-sensitive, very kind, and very considerate, always thoughtful of every one, and self-sacrificing; retiring in disposition, and not at all self-assertive. She relates, also, that Mrs. Miller and her daughter seemed to be congenial and companionable, but that Mrs. Miller had the stronger mind and appeared to dominate their actions and transactions; that Mrs. Stuart said to her, "I am giving her (Mrs. Miller) a deed, so as to buy them off, but it is my money that is going to pay for it;" that Mrs. Miller spoke slightingly of Stuart, and did not have any confidence in his business ability; that Mrs. Stuart told witness that Mrs. Miller told her (Mrs. Stuart) that Stuart's creditors could come back on her for his debts, and that Wana thought that she had to get this property out of her name, or the creditors of Stuart could take it for his bills. But, with all this, Mrs. Carman nowhere asserts that Mrs. Stuart indicated to her that she executed the deed against her will, or contrary to her voluntary and fixed purpose of conveying the land to her mother.

Other witnesses have testified along the line with Mrs. Carman, but none of them are so clear or explicit as she; nor do they go to the length that Mrs. Carman has gone, by reason of not being so intimate with Mrs. Stuart as she seems to have been; and it is unnecessary to refer to their testimony in greater detail.

Having examined the testimony thus far, let us pause to inquire whether the transaction of giving the deed of August 1, 1910, by Mrs. Stuart and husband to Mrs. Miller, constituted in the latter a constructive trust as to this Lake Labish land. If it be an express trust, and the nature of the instrument as constituting such a trust is to be estab-

lished by parol, then the complainant can have no relief, as the statute of frauds bars him, for it is statutory that no trust, or power concerning real property can be created, transferred, or declared otherwise than by operation of law, or by conveyance, or other instrument in writing subscribed by the party creating, transferring, or declaring the same. Richmond v. Bloch, 36 Or. 590, 60 Pac. 385. Nor can the transaction be said to have terminated in a resulting trust, for such a trust arises where one, having the funds of another, has purchased property in his own name. In such a case the party holding the property so purchased is held to be the trustee for the party whose money he used.

[1] A constructive trust arises where the purchase is made and the title is acquired contrary to trust relations existing between trustee and cestui que trust, or ex maleficio through deceit and fraud, whereby the party whose title has been taken away from him has been misled and overreached to his injury and detriment. Barger v. Barger, 30 Or. 268, 47 Pac. 702; Parrish v. Parrish, 33 Or. 486, 54 Pac. 352; Chance v. Graham, 76 Or. 199, 148 Pac. 63. At the time that the August 1, 1910, deed was made, Mrs. Miller occupied no fiduciary relation toward Mrs. Stuart. While some time prior thereto she did occupy such a relation, and held money in trust for her daughter, that relation had ceased by reason of the fact that Mrs. Miller had paid out more money for her daughter and at her instance than was coming to her. The real condition was that the daughter was indebted to the mother in quite a large sum.

[2] Nor did the relation of parent and child exist in the sense that the child was of tender years and was dependent upon the mother for nurture, protection, and advice. Mrs. Stuart was 32 or 33 years old, was married, and living with her husband, with whom she was upon terms of cordiality and devotion. She was sui juris and altogether capable of taking care of her own concerns and transacting her own business, especially with the assistance of her husband. So that there existed between Mrs. Miller and her daughter no relation of trustee and cestui que trust, nor that of parent and child in the legal sense in which that term is used in the books, where the child is presumed to be dependent in some relation upon the parent. Because of the existence of these conditions, the authorities relied upon by complainant, namely, Wormley v. Wormley, 8 Wheat. 421, 5 L. Ed. 651, Adams v. Cowen, 177 U. S. 471, 20 Sup. Ct. 668, 44 L. Ed. 851, Ludington v. Patton, 111 Wis. 208, 86 N. W. 571, Springer v. Young, 14 Or. 280, 12 Pac. 400, Baldock v. Johnson, 14 Or. 542, 13 Pac. 434, Johnson v. Savage, 50 Or. 294, 91 Pac. 1082, and other like cases, do not seem to me to be in point.

That Mrs. Stuart was not controlled in the giving and execution of the deed by any undue influence exerted over her by Mrs. Miller is scarcely a debatable question under the evidence. Stuart himself yields to the proposition that the act was freely done. When he was asked if he thought Mrs. Miller dominated Wana in the making of the deed, or induced her to do anything that she was not willing to do willingly and freely, he answered:

"Why, I think that there was not any hesitancy about signing this deed, because it was represented to us that it would be just a temporary matter, and it was signed freely enough. * * * As far as I understand, the actual transfer of the property was made freely."

The next inquiry is: Was Mrs. Stuart deceived or misled into doing what she did? In other words, was there mala fides in the transaction on the part of Mrs. Miller? Mrs. Miller contends that the deed was absolute, and was intended to settle all matters between her and her daughter. It must be conceded that the money consideration for which Mrs. Miller claims the deed was given was wholly disproportionate to the value of the land. Mrs. Miller shortly subsequent gave an option to purchase at a stipulated price of $125 per acre. Hartog, who made a special survey to determine the present value, fixes it at $50 per acre, which would bring the worth of the land up to $33,750. I am inclined to believe his estimate was near the real value at that time. Mrs. Stuart owed Mrs. Miller at the time less than $10,000, possibly not largely above $5,000. This is a circumstance which would seem to discredit Mrs. Miller's contention, because persons do not willingly give another such marked advantages in business transactions.

If it be true, as Stuart claims, that Mrs. Miller took the deed with the promise and agreement on her part merely to use it to enable her to straighten out the affairs pertaining to the drainage of the land, and possibly to clear up the title in some respects, or, as Stuart expresses it, "simply for the better handling of the property," but intending at the time to disregard such promise, and to claim absolute title, this will amount to deceit, and she would be chargeable as a trustee ex maleficio. The principle applicable in such a case is well stated by Mr. Pomeroy (Pomeroy's Equity, § 1055, quoted in Parrish v. Parrish, supra), as follows:

"A second well-settled and even common form of trusts ex maleficio occurs whenever a person acquires the legal title to land or other property by means of any intentionally false and fraudulent verbal promise to hold the same for a certain specified purpose—as, for example, a promise to convey the land to a certain designated individual, or to reconvey it to the grantor, and the like—and, having thus fraudulently obtained the title, he retains, uses, and claims the property as absolutely his own, so that the whole transaction by means of which the ownership is obtained is in fact a scheme of actual deceit."

But there is another moving and potent feature which actuated the giving of this deed, and which was well understood by all the parties. I refer to the indebtedness which was hanging over Stuart. Mrs. Miller had had an experience with Alexander, the former husband of Wana, which was not at all to her liking, and Stuart himself had incurred her distrust. Obviously her daughter was well aware of this, and had manifestly come to the conclusion that it would be well to protect herself from pecuniary danger from this source. And, being on cordial terms with her mother and willing to trust her implicitly, knowing that she was her only heir at law, she was persuaded that the best solution of the problem was to deed the property to her mother in absolute right. This will become more apparent as we examine what was subsequently done, after Hayes became interested in the property. Now, if such were Mrs. Stuart's purpose, having in mind,

also, that she was in her mother's debt, and was without means of handling the property so as to bring it into the market or to render it profit-bearing, then there was ample consideration for upholding this deed as a conveyance absolute to her mother.

I will pass now to an examination of the later transactions between the parties, including J. O. Hayes, the joint respondent with Mrs. Miller. It appears that it was soon discovered that a tract of 33.31 acres had been omitted from the deed of August 1, 1910. To correct this, Mrs. Stuart and her husband, on October 13, 1910, gave a warranty deed to Mrs. Miller for this tract. This deed was delivered, but never recorded. Stuart explains that it was given for the same purpose as the original deed. The Hartman & Thompson option had been renewed, running until the early spring of 1911. Hayes avows that the first time he had any conference with Mrs. Miller about this land was during the time that the option was in force. Mrs. Miller affirms this by saying that she never consulted with Hayes about the land prior to the date of the option. Near the close of the year 1911, or early in January, 1912, one Karn came to San Jose from Oregon for the purpose of completing an organization in view of furthering a scheme for the drainage of the land. Karn at this time made a proposal to Mrs. Miller to purchase the land at $35 per acre. Prior to this, however, some time late in the fall of 1911, Hayes, Mrs. Miller, and Mr. and Mrs. Stuart had a conference at the home of Mrs. Miller about this land, Mrs. Miller wanting to sell to Hayes, but no result was reached. But, when Karn came down, the subject was again taken up, and it finally resulted, on January 15, 1912, in Mrs. Miller giving a deed to Hayes for the land. The consideration for that deed was a verbal one, whereby Hayes was to bear the expense of draining, clearing, and selling the land, and to give her half of the proceeds. Mr. Hayes agrees with her, except that he states the primary understanding was "that the price was not to be less than $35" per acre, and that, if he thought the land was worth more, he would give her what it was worth. But he agrees that the final conclusion was as Mrs. Miller states it, with the qualification that Mrs. Miller was to have half of the proceeds after deducting the expense attending the drainage, clearing, etc. There is no further controversy as to this agreement remaining, as it has since been reduced to writing. It was not so reduced to writing, however, until after this suit was instituted.

According to Stuart, he knew about the making of the deed by Mrs. Miller to Hayes in this way, namely, that Mrs. Miller explained to him and his wife that Hayes was taking over the property out of pure kindness and friendship for Mrs. Miller, and in return for services that Mrs. Miller had rendered his (Hayes') family, and that the property was to be turned over to Hayes, so that he could handle it as though it were his own. Mrs. Miller and Hayes both deny that Hayes' services in connection with the land were to be a gratuity. On examining the abstract to the land, Hayes says he discovered that the 33.31-acre tract had been omitted from the deed of Mrs. Stuart and her husband to Mrs. Miller. Later, on February 7, 1912, at Hayes' request,

Wana and Stuart gave to Hayes a deed to this tract. Stuart seems to think that this deed was given merely to enable Hayes to carry out his understanding with Mrs. Miller that he was to handle the property as a gratuity for the family.

Hayes immediately took charge of the property, participated in the drainage organization, and has since expended approximately $60,000 in draining and clearing the land; $35,000 of this money was borrowed on the land, and mortgages given by Hayes to secure payment. The balance has been advanced by Hayes himself. A couple of pieces of the land have been sold, however, and Hayes has the proceeds in his hands, except a portion remaining unpaid. Hayes protests that, when he dealt with Mrs. Miller respecting the land, he had no knowledge whatever that Wana ever owned an interest in it, and that it was not until after he saw the abstract that he was advised of the fact. Whether he did or not, it is not very material in the view I have come to relative to the August 1, 1910, deed.

After Hayes had been handling the property for more than a year, and shortly prior to March 17, 1913, Stuart being in Hayes' office on some business of his own, said to Hayes that Mrs. Miller held the Lake Labish land in trust for Wana. Hayes denied that he knew anything of the kind. Hayes became concerned about it, and sent for Mrs. Miller. Their conference resulted in Hayes sending for Wana and a conference with her alone. He says that Wana corroborated her mother by stating to him that her mother owned the land, and that she (Wana) had "no interest in it at all." Thereupon Mrs. Stuart unfolded to Hayes that her mother had plans for the disposition of her property at her death, and that Mrs. Stuart was herself in perfect accord with her mother's plans. Further conference between Mrs. Stuart and her mother resulted in the agreement of March 17, 1913. The agreement was drawn by Hayes, and was signed and executed by them in his office, and was left in his hands for safe-keeping.

This document, after reciting that there had long been dealings between the parties in a pecuniary way, and that they had then settled all their mutual accounts, contains a declaration on the part of Mrs. Stuart that she has no interest in or claim to any of the Lake Labish lands, and that Mrs. Miller is the sole owner thereof, free and clear of any interest or equity therein on her (Wana Stuart's) part. It is further stipulated on the part of Mrs. Miller that she will pay Mrs. Stuart the sum of $10,000, on or before five years from the date of the agreement, or transfer to Mrs. Stuart securities or real property of that value, as Mrs. Miller may elect; and it was further agreed that Mrs. Stuart should have the right to make disposition by will of the money or property thus to be paid to her. On the same day Mrs. Stuart gave to Mrs. Miller a bargain and sale deed to all the Lake Labish lands. Stuart did not join in this deed, nor was he apprised of the execution of either the settlement agreement or the deed until after Mrs. Stuart's decease.

It seems that there was a general understanding between Mrs. Miller, Wana, and Mr. Stuart, at the time the August 1, 1910, deed

was given, and thereafter all through the transactions, that Mrs. Miller would make disposition of her property to Wana. Stuart himself concedes as much. I quote from his testimony:

"Q. Mr. Stuart, during Wana's lifetime the question of the disposition which Mrs. Miller was going to make of her property was discussed among you folks around the house, was it not? A. The discussion—the only discussion—in regard to that, that I can recall, was at the time of Mrs. Miller's trip to San Diego, and later her operation. Q. Well, so far as you ascertained from the discussions about the home, it was Mrs. Miller's intention, was it not, to leave all her property to Wana? A. That was—yes, that was understood generally. Q. That was always understood, wasn't it, in your discussions and arrangements? A. I think I might say that there was an understanding that the property, Mrs. Miller's property, would be left to Wana at her death. Q. That was the understanding among you people there, about the house? A. I think there was some such understanding. I don't know that there was any definite understanding that I could say, except, as I say, at the time Mrs. Miller went to San Diego, and at the time she was operated upon, there was a will made. Q. But you have heard Mrs. Miller, have you not, express her intention to leave all her property to Wana, during this period of years from 1909 on? A. I don't know that I could say that I have heard definite expressions in regard to it. It was a sort of general understanding, I think, sort of an indefinite thing. Q. That understanding, as you describe it, existed at the time this deed in 1910 was made, did it not? A. So far as I know, I don't think there has ever been anything definitely said about it. Q. Isn't it the fact, Mr. Stuart, at the time this deed of 1910 was made, and all through these transactions, so far as you people understood, it was always Mrs. Miller's intention that when she died all her property should pass to Wana? A. I cannot say that there was a definite understanding about it, I say. It was, so far as I know, a general understanding that that would be the case. I don't know of any reason that it was not understood."

It is not confirmed that Mrs. Miller made a will at the time she went to San Diego, alluded to by Mr. Stuart, and it is a fact that she never made a will subsequently and prior to Wana's death; but it was in Mrs. Miller's mind to do so, as she had even gone so far as to discuss the details of her testamentary disposition, intending that Wana should have the principal part of her property.

Mention is made of Mrs. Miller's wanting to tie up the property in such a way that her daughter would be secure in its possession. Mrs. Miller speaks of this. On being asked:

"Now, what was your plan for disposing of your property after your death?"

—she goes on to say:

"All that I ever had, and the only (interruption) object I ever had, was for my daughter, to tie up * * * and keep everything, so she would have that after my death, so that she would have it, so that she could not—nobody could —get it, and she could not spend it, so that she would have enough to live on as long as she lived. That was the only idea that I ever had in my life, in all my life, was my child."

Her attention being called to the time the contract was drawn, she proceeds:

"I didn't have any will at that time, because I expected, as soon as I could get everything straightened up and tied up—I was going to have it tied up for her instead of any will about it. I wanted it tied up in a way that she never would want for anything."

There was talk of an arrangement for putting the property in the hands of a trust company, but that was not matured. Later Mrs. Miller testified further as to what she meant by tying up the property:

"Q. Yes; you testified this morning concerning your intentions as to what you were going to do with your property, where it was to go in case of your death. What was your intention as to who should receive your property? A. I wanted to tie it all up for my daughter as long as she lived; and then I made no further thought of it. Q. You had not decided yet what else you would do with it? A. No; I had not decided. I thought she could do that as she pleased before she died. If she lived to be 70, why she could use it, manage it, as she desired. Q. Did you discuss with your daughter, Wana, what your intentions were with regard to the disposition of your property? A. I did. We talked it over many, many times. Q. Was she agreeable to what you had decided to do? A. Very much so; very much so. Q. Did she at this time make any claim that any of the property which you had in your name belonged to her? A. What do you mean by that? Q. Did your daughter, Wana, at the time that this contract of 1913 was signed—did she at that time make any claim to any of this property that you intended to dispose of? A. No; she never made any claim to it after we made the contract. Then that settled all that, and then she made a deed following that. Q. She made a deed at the same time as the contract? A. Yes; at the same time. Q. Did she ever claim the Lake Labish property as her own after the deed of August 1, 1910? A. Never did; never did."

Hayes refers to the same matter, and thinks Mrs. Miller began to discuss it with him in 1911, some time after January 1st:

"Q. Very well, now, this testamentary proposition doesn't arise until 1913, as I understand you? A. Oh, yes; she talked with me before that. Oh, certainly; we had the matter well under way at that time. There was one thing that delayed it, why it had not been consummated before."

Then witness refers to the scheme for putting the "whole thing in the hands of a trust company."

This testimony of Mrs. Miller and Hayes indicates quite clearly what Mrs. Miller meant by tying up the property. It was to be a disposition on her part for Mrs. Stuart's benefit. Stuart understood very well Mrs. Miller's intention of disposing of her property by testament for his wife's benefit, but does not evince knowledge of the supposed purpose of tying up the property.

Now, recurring to the settlement agreement of March 17, 1913: Here we get the first intimation that Mrs. Stuart was concealing anything from her husband. She undoubtedly did keep this transaction from his knowledge, as he was not apprised of it until after her death. There is one of two reasons why she concealed this transaction from him: Either her mother and Hayes, one or both, had complete dominion and control over her, and prompted her in doing what she did, or she concluded for herself that it was best to keep the transaction from her husband, knowing that he had sought to interfere in the business dealings between her and her mother and her mother and Hayes. From a careful scrutiny of the testimony of Mrs. Miller and Hayes, the only witnesses alive to speak to the transaction of the agreement and deed of March 17, 1913, I am firmly persuaded that Mrs. Stuart thus asserted her independence of her husband with a view to furthering her own ideas as to the disposition of the property that she expected to come to her in the end, which in

the meantime she believed would be protected from the claims of Stuart's creditors. I have no reason for wholly discrediting Mrs. Miller and Hayes, and, to find that Mrs. Stuart was controlled by their overpowering persuasion, I should have to do so. Both are highly respected citizens of the community in which they live, and there is nothing inherent in their testimony that would seem to render them unworthy of belief.

To conclude: To my mind, after a careful study of the whole testimony in the case, the deed of August 1, 1910, was given for the purpose of passing the absolute title to Mrs. Miller. The deed is supported by the amount then owing to Mrs. Miller by her daughter, and the understanding that the transfer was necessary to avoid any complications with Stuart's creditors; the further condition being present that Mrs. Stuart was the only child of Mrs. Miller, and would be provided for by testamentary disposition on the part of Mrs. Miller. The agreement of March 17, 1913, is explanatory of this result. Mrs. Stuart was provided for in part, with independent means, during the life of her mother. Otherwise, their relations remained the same. The agreement itself, aside from providing Mrs. Stuart with an independent estate, was adopted as a measure for quieting the title in Mrs. Miller, and in Hayes holding under her, and its construction is well calculated as a means to that result.

Complainant's bill will be dismissed, with costs to the respondents.