## RIGGS et al. v. GILLESPIE.

(Circuit Court of Appeals, Fourth Circuit. February 27, 1917.)

No. 1471.

1. INJUNCTION ⟨⟩29—RESTRAINING LEGAL PROCEEDINGS—DEFENSE—FRAUDULENT RELEASE.

A court of equity has jurisdiction to enjoin defendants in an action at law from asserting as a defense a release under sale obtained by fraud, even though it is doubtful whether plaintiff would be unable to rely on the fraud in the action at law.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 66, 67.]

2. RELEASE ⟨⟩57(2)—EVIDENCE—FRAUD AND UNDUE INFLUENCE.

In a suit to restrain the sureties on an executor's bond from setting up as a defense in an action on the bond a release of one of them, evidence *held* to show that the release was obtained by the surety by fraud and undue influence upon the only heir of the estate, who was a nephew of the surety and at the time visiting in his home.

[Ed. Note.—For other cases, see Release, Cent. Dig. § 108.]

3. RELEASE ⟨⟩17(1)—FRAUD—CONFIDENTIAL RELATION.

Where the uncle of an orphan heir, a man of much business experience and who knew that the heir had the utmost confidence in him, induced the heir to release him from liability as surety on the executor's bond, the heir being ignorant of the effect of such release, the uncle was guilty of equitable fraud even if he did not say anything to deceive or mislead the heir.

[Ed. Note.—For other cases, see Release, Cent. Dig. § 32.]

4. INJUNCTION ⟨⟩119—PLEADINGS—ANSWER—IRRELEVANT FACTS.

In a suit to enjoin the assertion by sureties in an action on an executor's bond of a release fraudulently obtained by one of them, it was not error to strike from the answer paragraphs setting up the execution by the heir of another release to all the sureties given in a separate transaction after the execution of the first release, especially where the decision of that motion was reserved for final submission and no evidence was offered in support of those paragraphs.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 243–250.]

5. INJUNCTION ⚖➾113—RESTRAINING DEFENSE AT LAW—LACHES.

A suit to restrain sureties on executor's bond from relying on a release given to one of them by the sole heir as a defense is not barred by laches, where the heir used due diligence in instituting suit against the executor for an accounting, though more than five years had elapsed since the execution of the release.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 198–201.]

Appeal and Cross-Appeal from the District Court of the United States for the Northern District of West Virginia, at Parkersburg; Alston G. Dayton, Judge.

Suit by John J. Gillespie against Caleb B. Riggs and others to restrain the defendants from asserting as a defense to an action at law a release given by plaintiff to one of them. From a decree (229 Fed. 760) granting injunction except as to the liability of the defendant to whom the release was given, the other defendants appeal, and plaintiff files a cross-appeal. Decree reversed, and cause remanded, with instructions.

Jennings C. Wise, of Richmond, Va., and Charles E. Hogg, of Point Pleasant, W. Va. (Boreman & Carter and C. B. Rigle, all of Middlebourne, W. Va., on the brief), for appellants and cross-appellees.

Thomas P. Jacobs, of New Martinsville, W. Va., and David F. Pugh, of Columbus, Ohio (John H. McCoy and Arlen G. Swiger, both of Sistersville, W. Va., and Pugh & Pugh, of Columbus, Ohio, on the brief), for appellee and cross-appellant.

Before PRITCHARD and WOODS, Circuit Judges, and ROSE, District Judge.

PRITCHARD, Circuit Judge. This is an appeal and cross-appeal from the District Court of the United States for the Northern District of West Virginia.

The facts are as follows: The father of appellee, Wm. H. Gillespie, died in 1897, leaving a will and testament disposing of about $40,-000 worth of property, and the appellee was his sole heir at law. Walter R. Smith, one of the cross-appellees, was appointed as his executor. The other appellants and cross-appellees and Lloyd L. Stealey, who died before the litigation was instituted, as his sureties executed a joint and several bond in the sum of $40,000. For about 14 years the executor administered upon the estate. He made no settlement of his accounts during that time. After the appellee became of age, he instituted a suit in the circuit court of Tyler county to compel him to settle his accounts. A commissioner was appointed by the court, who reported that appellee was entitled to the sum of $36,008.84, upon which the court entered a decree in his favor.

On the ———— day of October, 1914, appellee instituted an action at law in the United States District Court upon the bond of the executor and six sureties. The appellants filed a separate plea pleading an alleged release purporting to have been given by appellee to John M. Smith, one of the sureties. The release in question reads as follows:

"Whereas, Walter R. Smith, of Sistersville, in the county of Tyler, and state of West Virginia, is administrator of the estate of William H. Gillespie, de-

ceased, late of Sistersville, and John M. Smith, of Wilbur, in said county and state, is surety upon the bond of said Walter R. Smith as such administrator, and John Gillespie of said Sistersville. is now the sole heir of said estate and of full age: Now, therefore, I, the said John Gillespie, in consideration of the sum of one dollar ($1.00) and other good considerations to me in hand paid by the said John M. Smith, have released and discharged and do hereby release and discharge the said John M. Smith from all and every obligation as a surety or otherwise upon the said bond of said administrator, and from all liability to me by reason of said bond.

"Witness my hand and seal this 29th day of September, 1909."

Appellee, being of the opinion that in an action at law he could not traverse the defense made by this plea, instituted a suit in equity praying for injunctive relief, in which, among other things, it is alleged that the defense made by this plea in the action at law is inequitable in that:

First. There was no valuable consideration to the execution of said release.

Second. That it was not his intention to release the other sureties.

Third. That it was obtained from him by fraud committed by John M. Smith.

Fourth. That even if there were no such reasons for the impeachment of the release, it in equity only operated as a release to John M. Smith of his proportion of the liability on the bond, and to the other sureties of the one-seventh part of the total liability, for which the action at law was brought.

It is alleged in the bill that the release pleaded in the common-law action is neither a release to John M. Smith, who secured it from his nephew, the appellee, nor a release in any sense to the other sureties; that appellee could not in a court of law secure the relief which he seeks, to wit, to destroy and annul a fraudulently obtained release and to grant such other and further relief to which appellee may be entitled. Therefore this suit was instituted on the equity side of the court.

The bill alleges that on the 29th day of September, 1909, John M. Smith secured the release in question from his nephew, the appellee, at a time shortly after he had reached his majority; that appellee's mother was a sister of John M. Smith; and that the consideration recited in the release is $1, none of which was paid. It is further alleged: That at the time the release was secured appellee did not know how much W. R. Smith, executor, owed him, inasmuch as no settlement had been made at that time. That he was young and inexperienced and had no knowledge of the effect and character of legal papers or documents. That he was persuaded to sign the release by the false representations of John M. Smith to the effect that the execution of the release would not in any way prejudice his right as sole devisee, legatee, or heir of his father, and that he had no opportunity to advise with counsel or friends, being at the time at the home of John M. Smith, some 20 miles distant from his home and friends. That he was a mere child when his father died, about 12 or 13 years of age, and was brought up after the death of his father by W. R. Smith, executor, and Miss Thene Smith, his mother's sister, in his father's home, where he remained until his marriage in July, 1909, at which time he moved to himself; that shortly thereafter John M. Smith went to his home in the city of Sistersville and invited appellee and his wife to visit them, stating at

the time that he wanted them to get better acquainted. That in response to this invitation they visited Smith on the 25th day of September, 1909. That he had been brought up from childhood under the Smith influence. That his uncle, W. R. Smith, and Miss Thene Smith had controlled his every action and exercised great influence over him, and that W. R. Smith, the executor and guardian, concealed from him the true condition of his father's estate. That after he had been at the home of his uncle, John M. Smith, for a few days, to wit, on September 29, 1909, John M. Smith presented a paper called a release, and while in the presence of his uncle, in his home and under his influence, requested him to sign the same, asserting at the time that he did not want anything to trouble him and that it could not make any difference, inasmuch as there were enough sureties on the bond to carry it, and that he wanted him to release him as surety. The paper which he presented was prepared by John M. Smith's brother, a lawyer, who resided in Minnesota. That under these circumstances he yielded and signed the paper for no consideration whatever. That at the same time John M. Smith told him that there was little, if anything, coming from his father's estate, and that the paper in question would not release any of the other sureties. That owing to his lack of knowledge of such matters he relied upon the statement of John M. Smith in this respect. That all this was simply a fraudulent scheme by which John M. Smith sought to release himself, if possible, from all liability on the bond. That while visiting his uncle he enjoyed his hospitality. That the members of the family were extremely kind to him, and that they secured the release at the opportune moment when he felt under great obligations to his uncle and family for their entertainment and at a time when he was in no mental condition to deny a request from his uncle. In this connection, it is alleged by appellee that neither he nor his wife were ever again invited to make a visit, nor were they ever visited by his uncle, John M. Smith. It is insisted by counsel for appellee that the facts as alleged clearly show that the release in question was obtained by fraud, imposition, duress, undue influence, and misrepresentation, and that therefore in equity such release is null and void.

The appellants filed a motion setting forth that the bill failed to allege any matter of equity, in that the release could be avoided in a court of law as well as in a court of equity, and that the question of the validity of the release could be controverted in an action of debt; that appellee has been guilty of gross laches in instituting this suit; and that therefore appellee is not entitled to the relief prayed for in the bill.

Appellants also filed their joint and several answers which consist of denials of the allegations of the bill, more especially the allegations as to misrepresentations and frauds imputed to John M. Smith.

In paragraph 23 of the answer, a further contract and agreement between appellee and appellants is set forth, the substance of which being that the appellee agreed with the appellants and the executor of L. L. Stealey, deceased, that in consideration of a loan of $17,000 to the appellee to enable him to purchase the Bloomingdale farm, in Henrico county, Va. (which the executor had purchased with money belonging

to the estate), part of the purchase price being paid, and to secure the remainder, he had given a deed of trust under which it was about to be sold; that he released the sureties on the bond of W. R. Smith as executor from all liabilities of the payment of any money then due or to become due to him from W. R. Smith as executor.

In paragraph 24 (improperly numbered 23) it is alleged that C. S. Stealey as executor of L. L. Stealey, deceased, is a necessary and proper party to the suit.

The appellee entered a motion to strike out these two paragraphs of the complaint upon the ground that they did not constitute any defense to the bill. A consent order was entered, in which it is recited that all motions and questions raised thereby should be reserved "for the final submission of this cause, and that the evidence of the parties shall be taken," and that the parties be permitted to take their evidence before some competent legal authority upon reasonable notice, and that the action of debt should stand continued until the equity cause was disposed of.

Both parties took depositions which were filed. However, appellants did not take any depositions nor offer any evidence in support of the paragraphs of the answer which the appellee had moved to strike from the record. The court below entered a decree overruling the motion of appellants to dismiss the bill and sustaining the motion of appellee to strike out all of appellant's answer, consisting of the paragraphs to which we have referred, and also granted an injunction restraining appellants from using the alleged release for any other purpose than to secure for themselves in the trial in the action at law a credit for such sum as John M. Smith would have been liable for if he had not been released; such sum to be the full and equal of what the solvent parties may have to pay or be liable for.

[1] The appellants insist that a court of equity is without jurisdiction to grant the relief sought by the bill. The release which appellee seeks to annul, as we have already stated, is under seal. This question is well-settled, as will appear from the following cases which we cite:

In the case of Davis v. Wakelee, 156 U. S. 680, 15 Sup. Ct. 555, 39 L. Ed. 578, it was held:

That a suit in equity may be "sustained in favor of a plaintiff in a proposed action at law, to enjoin the defendant from setting up a threatened defense, upon the ground that he is equitably estopped from so doing, * * * when the remedy at law" is not "plain, adequate, and complete. * * *

"In the uncertainty which appears to exist in that state, as to whether a complaint setting forth all the facts would or would not be demurrable, we think it may be fairly said that the remedy at law is not so plain or clear as to oust a court of equity of jurisdiction. It is a settled principle of equity jurisprudence that, if the remedy at law be doubtful, a court of equity will not decline cognizance of the suit. * * * Where equity can give relief, plaintiff ought not to be compelled to speculate upon the chance of his obtaining relief at law."

This question was passed upon by the Supreme Court of West Virginia in the case of Rogers v. Rogers, 37 W. Va. 407, 16 S. E. 633; the second syllabus in that case being as follows:

"Equity will restrain by injunction, not only the suit at law itself, but also the introduction of evidence in such suit, which, though perhaps legally admissible, is manifestly contrary to right and justice."

Indeed, it is generally conceded to be the rule that the power to reform written contracts for fraud or mistake is vested in courts of equity, and that such power cannot be exercised by common law courts. In George v. Tate, 102 U. S. 564, 26 L. Ed. 232, Justice Swayne, said:

"It is well settled that the only fraud permissible to be proved at law in these cases is fraud touching the execution of the instrument, such as misreading, the surreptitious substitution of one paper for another, or obtaining, by some other trick or device, an instrument which the party did not intend to give."

The following cases are very much in point: Handcock et al. v. Cossett (C. C.) 45 Fed. 754; 1 Pomeroy's Equity Jurisprudence, 383; Messinger v. New England Mutual Life Ins. Co. (C. C.) 59 Fed. 529; Hartshorn v. Day, 19 How. 211, 15 L. Ed. 605.

The rule is so well-established that we do not deem it necessary to enter into an extended discussion of this point. We have carefully considered the cases cited by appellants, but do not think that they apply to the case at bar. In view of what we have said, it follows that the action of the court below in assuming jurisdiction of this suit was proper.

[2] We will next consider the question as to whether the court erred in dismissing the bill as to the defendant John M. Smith; i. e., in holding that the release is valid and constitutes a valid release to the appellee's action against John M. Smith.

Would one in the full possession of his mental faculties and not under any delusion enter into a contract of this character, and could an honest and fair-minded man accept the same? These pertinent inquiries arise at the threshold of this case, and should be met in order to reach a correct conclusion as respects the merits of this controversy.

In determining the question as to whether plaintiff was induced to sign the release on account of undue influence, it becomes necessary to consider the situation of the parties at the time it was executed. As we have already stated, appellee's father died when he was about the age of 13. He was then placed in the custody and under the control of his near relatives consisting of an aunt and an uncle, who, no doubt, were as near and dear to him as if they had been his own parents. He spent his childhood with them, and it was but natural that he should have become very much attached to them, and this applies with equal force to his uncle, John M. Smith, through whose influence he was induced to sign the release in question. Indeed, it is difficult to imagine a situation where the relationship could be more intimate. Under these circumstances, it would have been well-nigh impossible for any one to have convinced this young man that his relatives were not his best friends, and that they would, under any circumstances, betray his confidence or permit anything to be done that might militate against his welfare. In a word, the relationship thus established was precisely in the nature of the relationship that exists be-

tween parent and child, and it is in such light that we must consider the circumstances of this case.

It is true that at a proper age he was sent to school and received what might be termed a fairly good education, but there is nothing in the evidence to indicate that while attending school anything transpired that could have in the least impaired his confidence or marred the relationship that had existed between them from the day his father died.

It further appears from the evidence that after he left school he married and settled down, no doubt with the belief that the estate which his father had left him would be ample to insure his comfort in the future. It was at this time that John M. Smith, his uncle, invited appellee and his wife to become his guests, and during their visit both Smith and the other members of his family were at great pains to make their stay pleasant and enjoyable. They spared no efforts to make them feel perfectly at home and to realize that they were being entertained not selfishly but purely on account of the relationship that existed between them. At the time that appellee was about to depart, this uncle, under the guise of love and friendship, approached him with the request that he sign a paper, the legal effect of which was to deprive appellee of a portion of the patrimony that had been left him by his father.

The appellee while on the witness stand, when asked why it was that he had always regarded his uncle as an upright man, said:

"Well, I hardly know whether I could explain it in words exactly what it was that produced that, for you, or not. It was inculcated in me by every one that was around him; my aunt and my uncle and my mother all looked up to him as being the head of the family, the oldest one, a very good man and upright in every way, and I had always looked upon him in that way. I knew that he had held a great many positions of trust of various kinds."

The witness also, in reply to further questions, said:

"Q. State whether or not he stated to you his purpose in asking you in there? A. Yes, sir; he told me he wanted me to sign a release. He said he was an old man, well up in years, and that just recently he remembered he was on the bond, and went on to cite certain other men who were on the bond with him—I don't remember who he said at that time, but it had been brought to his memory by hearing the fact that W. R. Smith was in difficulty with T. J. Anderson, and he told me his property at that time had been practically all transferred to his sons.

"Q. That is, Mr. John M. Smith's property? A. Yes, sir; it had all been practically transferred to his sons, he said. And he represented to me that the release would only release him, and would not release the rest of the sureties, and it would be a great personal favor to him, and that the amount of money due me from W. R. Smith could not be so very much, and that the rest of the bondsmen would be good for whatever was due, and he said he would be very glad for me to sign it. I had always, ever since my earliest recollection, been brought up to look upon him as what most people would call a pillar of righteousness, a man who would not do any wrong of any kind. I had always been raised up with the Smith family. I was very young when my father and mother died, and whatever he told me, I believed it implicitly, and when he said to me that he would like for me to sign the release, naturally I signed it, and, so far as I knew, that was all there was to it, and that it only released him personally, and did not affect the other sureties at all."

He further testified that at that time he did not have sufficient legal knowledge to enable him to write a release deed or other document of similar character; that he had never given legal matters any attention whatever, and therefore possessed no knowledge whatever in regard to documents of this kind; that after the paper was presented to him for his signature he had no opportunity to consult counsel or friends, and he at that time felt that he had no reason to do so; that he considered his uncle's word as being as good as his bond—that the release was all right and "would not affect me financially." He further testified that before that time he had had no litigation whatsoever.

Under these circumstances, it was but natural that the nephew should have acceded to his uncle's request, especially in view of the fact that his uncle had informed him that what he was asking him to do was all right and that it could not affect his interest one way or the other. This is precisely the kind of power, the exercise of which places one situated like appellee in a position where the law deems him incapable of exercising that judgment and free will so essential to the intelligent disposition of his property or making contracts affecting the same. Adams v. Cowen, 177 U. S. 471, 20 Sup. Ct. 668, 44 L. Ed. 851; Taylor v. Taylor, 8 How. 183, 12 L. Ed. 1040; Comstock v. Henon, 55 Fed. 803, 5 C. C. A. 266.

2 Pomeroy's Equity Jurisprudence, § 951, in referring to this phase of the question, contains the following:

"*Undue Influence.*—Where there is no coercion amounting to duress, but a transaction is the result of a moral, social, or domestic force exerted upon a party, controlling the free action of his will and preventing any true consent, equity may relieve against the transaction, on the ground of undue influence, even though there may be no invalidity at law. In the vast majority of instances, undue influence naturally has a field to work upon in the condition or circumstances of the person influenced, which render him peculiarly susceptible and yielding, his dependent or fiduciary relation towards the one exerting the influence, his mental or physical weakness, his pecuniary necessities, his ignorance, lack of advice and the like. All these circumstances, however, are incidental and not essential."

It is earnestly contended by appellants that appellee knew a great deal more about the condition of the estate than his uncle, J. M. Smith; that he obtained this information from a letter written him by the executor in 1908. We have carefully considered the letter in question, but we find nothing contained therein that could have furnished him the information necessary to properly apprise him of the true condition of his father's estate at that time. While it is true that this letter informed him that his father's estate amounted to less than $30,000, it should be borne in mind that the letter also contained the information that the executor had paid out for building $1,680; a note due his grandmother of $1,565; note to John Arthur of $5,385; note due Kate of $336; building and loan, $600. The letter also stated that the appellee had received $5,000, making a total of $14,566. The letter then proceeds to say:

"Wanted to do the best thing by you and put the money where it was safest and I did not see anything that looked better to me than Bloomingdale. You, John, will no doubt, find nothing safer than a good piece of real estate. When the farm was bought it was not my intention to have the deed made to my-

self, but did that upon advice of Mr. Jiller, as he said if the west side was sold in lots, it could not satisfactorily to buyer be deeded. As I was tied up in the R. R. matter I did not have the money to meet the payments, and having collected outside of what you got $10,000.00, I used it in meeting the payments, having the note endorsed as paid by W. R. Smith, Exec. and Agt., leaving the money secured by the land, making in all $18,000.00 paid on the farm. There is $1,500 of Com. Bank Stock. Don't know whether that was a good investment or not. At the time I took it all banks seemed to be doing well. It has not paid more than four per cent., which was better than a 6 per cent. loan. I don't know whether it could be sold or not. When I bought 10 shares it was worth 110 to 116. I paid 100. Don't know what it's considered worth now. There is $8,500 secured by mortgage that cannot legally be collected for a few months, and $2,000 that I think may be gotten before long."

From this letter it appears that the executor was not indebted to appellee, but that, on the other hand, appellee was indebted to the executor over $2,000.

This was the situation of affairs at that time as shown by the letter in question. Therefore it will be seen that this letter could not, in any event, be used for the purpose of showing that appellee understood at the time that the executor was indebted to him in anything like the sum which appellee finally recovered from the executor in the District Court. This piece of evidence, we think, tends to show that appellee was not fully advised as to the true situation at the time he executed the release.

[3] It is contended by counsel for appellants that there is not sufficient legal evidence to show that this release was obtained by fraud or misrepresentation. We cannot give our assent to this proposition, feeling as we do that the evidence clearly shows that it was the deliberate purpose of appellee's uncle to not only take advantage of the relationship existing between them, but that he also misrepresented the facts as to the true situation; but, even if this were not true, his uncle was a man of much experience in business affairs, having held positions of trust, and therefore was capable of exercising intelligent judgment as to the best method by which he could be released from the obligation that he had incurred as surety on the executor's bond, and, knowing that his nephew had the utmost confidence in him by reason of the relation that existed between them, induced him to sign the release. Under such circumstances, what he did was a fraud in equity, even if he had not done or said anything calculated to deceive or mislead appellee.

It is true that John M. Smith to a certain extent contradicted the evidence of appellee, but it sufficiently appears from his testimony that his memory is somewhat impaired on account of his age. In referring to the reason which prompted him to ask appellee to release him of his liability, he said that "he just asked John the question, if he was willing to release him of his liability I might have to pay in case W. R. did not make good, and he said he would." It is contended that, in view of this statement, we should infer that without any particular purpose in view he asked appellee to release him. In this connection it is significant that he only secured the release for himself. Indeed, we think the evidence shows most conclusively that this

release was secured by a cunningly devised scheme, where the schemer laid his plans in advance, confidently believing at the time that his nephew, owing to the relations that existed between them, would, in all probability, comply with his request.

[4] It is urged that the court below erred in sustaining the motion to strike out certain paragraphs in the answer to which reference was made in the statement of facts. In the first of these paragraphs, as we have stated, it is alleged that Walter R. Smith, executor, purchased a farm called "Bloomingdale," situated in the state of Virginia, and paid for the same with money belonging to the estate; that notes were executed for the purchase money, secured by a deed of trust on the premises for the unpaid balance; that this deed was made to Walter R. Smith, but not as executor; that he paid all the purchase money except $16,300; that before appellee became 21 years of age he took charge of this property and remained there for some time after he reached his majority, during which time he treated it as his own property and considered it a good investment for the estate of his father; that if this property had been properly handled he could have realized therefrom not less than $100,000, which would have been more than sufficient to pay the balance of $16,300; that the appellee, desiring to pay the balance of this purchase money, instructed the trustee to sell the farm after Walter R. Smith defaulted in the payment of the balance; that appellants and C. S. Stealey, executor of L. L. Stealey, deceased, entered into an agreement with the appellee by which they agreed to loan him $17,000 to enable him to buy the farm and pay the balance of indebtedness thereon, and also leaving a balance for other purposes; that this agreement was reduced to writing and a copy was filed with the answer and made a part of the same; that in consideration of the loan of $17,000 the appellee released the appellants and J. M. Smith and the estate of L. L. Stealey, deceased, from their liability on the executorial bond of Walter R. Smith; that the money which was loaned to appellee was raised by means of notes signed by the appellee as principal, the appellants, and C. S. Stealey, executor of the estate of L. L. Stealey, deceased, as sureties; that on the date of this agreement they did not know that the release of September 29, 1909, had been given to J. M. Smith; that the farm was worth at the time it was sold by the trustee not less than $50,000, and then pleaded the agreement or release as a bar. By the second paragraph or subdivision of their answer, they pray that C. S. Stealey, executor of L. L. Stealey. deceased, be made a party to this suit.

In pursuance of the new equity rules, these allegations were denied by the appellee. The appellants in the action at law did not set up these matters as a defense to appellee's cause of action in that court. Under these circumstances, we think the action of the court below in striking out these paragraphs of the answer was proper.

This suit is ancillary to the action that was instituted on the law side of the court, and was instituted for a specific purpose, to wit, to cancel the alleged release upon which appellants rely as their principal defense and that they be restrained and enjoined from interpos-

ing such defense in the action at law. Further, it appears that all of these transactions as respect the farm in Virginia took place after the alleged release here attacked was executed, and therefore could have no bearing on the validity of the same.

It also appears that, when the cause was submitted, the court "ordered and decreed that all motions and the questions raised thereby are reserved for the final submission of this cause, and until the evidence of the parties herein shall be taken."

It further appears that no proof was taken by appellants in support of the two paragraphs in question, and therefore there is no evidence in the record to support the allegations contained therein. If evidence had been taken, the court below could have had an opportunity to determine as to whether the issue should be remanded to the action on the law side of the court or decided by the judge sitting as a chancellor, and under these circumstances it is but fair to assume that appellants were not prepared to sustain the allegations contained in these paragraphs.

[5] It is also urged that appellee in not instituting suit at an earlier date is guilty of laches, and that, therefore, he cannot maintain the same. We do not think that this point is well taken in view of the fact that appellee used due diligence in instituting suit against the executor. Indeed, he seems to have taken the steps that were necessary to secure his rights with a reasonable degree of celerity, and, without entering into anything like an extended discussion of this phase of the question, we will content ourselves by saying that after considering the facts as respect his course of conduct we are of opinion that this assignment of error is without merit.

We think that the cases relied upon by appellants are easily distinguished from the case at bar. A careful consideration of all the facts surrounding this transaction impels us to the conclusion that the court below should have declared the release in question invalid. In addition to the authorities from which we have quoted, we cite the following in support of our conclusion: Connelly v. Fisher, 3 Tenn. Ch. 382; Kerr on Fraud, 143; Story's Equity Jurisprudence, 222.

In view of what we have said, we do not deem it necessary to discuss the other assignments of error.

For the reasons stated, we are of opinion that the decree of the court below should be reversed, and the cause remanded, with instructions for further proceedings in accordance with the views expressed herein.

Reversed.